JACKSON v. SIMMONS et al.

(Circuit Court of Appeals, Seventh Circuit. January 2, 1900.)

No. 566.

1. QUIETING TITLE—RIGHT TO MAINTAIN SUIT—EVIDENCE OF POSSESSION.

Under the Illinois statute which permits the bringing of a suit to quiet title only by one in possession. or one claiming title to land which is vacant and unoccupied, the construction on a tract of land, by a claimant, of a structure of rough boards, 8 or 10 feet square, with a flat roof, having no foundation, chimney, or windows, and a door with no lock, not intended for a dwelling, or for any other use, as far as shown, and which was in fact never used, does not constitute such possession and occupation of the land as will support a suit to quiet title; nor can the complainant, having alleged in his bill actual occupancy of the land, on the failure of the proof to sustain such allegation, claim that the land was vacant and unoccupied, for the purpose of bringing the case within the other provision of the statute.

2. EQUITY—CROSS BILL FOR AFFIRMATIVE RELIEF.

A cross bill seeking affirmative relief is in the nature of an original bill. It does not fall with a dismissal of the original bill in the suit, whether such dismissal is by the act of the complainant or the court; and hence, although relating to a subject germane to the matter of the original bill, it must rest upon some independent and recognized ground of equitable jurisdiction.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

The bill was filed by Charles E. Simmons, as complainant, in the circuit court of the state of Illinois for the county of Lake, on the 19th day of June, 1891, against the appellant, Lewis B. Jackson, to quiet the title to the N. E. ¼ of the N. W. ¼ and the N. W. ¼ of the fractional N. E. ¼ of section No. 15, in township No. 45 N., of range No. 12 E. of the third P. M., and the fraction lying east thereof, situated in the county of Lake. The complainant claimed to derive title to the premises through mesne conveyances from the government of the United States, his immediate grantors being, as to the undivided one-half

of the premises, William A. Butters, who conveyed February 19, 1891, and as to the other undivided one-half, Reuel E. Darling, who conveyed April 21, 1891. The complainant asserted in his bill that he was in actual possession of the premises, and that Jackson, the defendant below, claimed title thereto under a certain tax deed issued by the proper authorities to Oliver S. Lincoln, December 4, 1872, under a tax sale on the 16th day of August, 1870, to one Josiah N. Truesdale, grantor of Lincoln, for the taxes levied thereupon for the year 1869; that such tax deed was invalid for the reasons specified in the bill (not necessary to be here stated, it being conceded that the tax deed of itself was insufficient to give perfect title); that such tax deed constituted a cloud upon the complainant's title; and prayed that it might be set aside, declared null and void, and delivered up to be canceled. On the 2d day of November, 1891, on the petition of the defendant, and upon the ground of diverse citizenship, the cause was removed into the circuit court of the United States for the Northern district of Illinois, in which court the defendant below filed his answer to the bill on the 5th day of January, 1892, wherein he denied that the complainant at any time had possession of the premises, asserted the validity of the tax and tax sale and of the deed to Lincoln; that none of the grantors of the complainant, immediate or remote, had ever been in possession of the premises; that at the time of the sale to Lincoln the premises were unoccupied, and so remained for seven years thereafter; that Lincoln paid the taxes upon the premises levied in each year subsequent to the year 1869 for over seven years, and afterwards entered into possession of the premises, and so remained until his death on the 25th of May, 1889, whereupon his heirs conveyed the premises to the defendant Jackson, on the 11th day of July, 1889; and that he, or those under whom he claimed, have paid all the taxes upon the land from and including the year 1869 down to the year 1892; and he prayed the benefit of the statute of the state of Illinois (2 Starr & C. Ann. Ill. St. 1896, p. 2618, c. 83, § 7), which is as follows: "Whenever a person having color of title made in good faith to vacant and unoccupied land, shall pay the taxes legally assessed thereon for seven successive years, he or she shall be deemed and adjudged to be the legal owner of said vacant and unoccupied land to the extent and according to the purport of his or her paper title. All persons holding under such tax payer by purchase, devise or descent before said seven years shall have expired, and who shall continue to pay the taxes as aforesaid, shall be entitled to the benefit of this section." On January 5, 1892, the defendant below exhibited his cross bill, stating substantially the same facts as appeared by the bill and answer, and prayed affirmative relief to quiet the title to the premises in him.

The facts in regard to the character of the premises and their possession are these: They were situated upon the western shore of Lake Michigan, within the limits of the city of Waukegan. They were sand lots, and at times partially or wholly overflowed by water. They were incapable of cultivation, and were unoccupied for any purpose except, perhaps, by strolling fishermen, until about 1879 or 1880. At about that date—the precise time being left uncertain by the evidence—Lincoln gave license to one James Gamash, a fisherman, to drive piles in the lake from the shore, and to store these piles when the fishing season was over, upon the premises. He had racks for his boats, and the implements by which the piles were driven in the bed of the lake. These piles were 35 feet in length, and the fish nets were extended upon them. This paraphernalia was stored on the premises extending back from the water for a distance of 160 to 200 feet. At one time (the date being left uncertain by the evidence) there was a fence on the west line of the premises, but when and by whom erected (whether by Lincoln or by the owner of the premises adjoining on the west) does not appear. In March, 1891, and intermediate the deed from Butters and the deed from Darling, the complainant below erected upon the northeast quarter a small structure 8 or 10 feet square. No foundation was built, but scantling were laid upon a few small stones placed upon the surface of the ground, which was of pure sand, and some upright pieces at the corners, upon which boards were nailed, and a board roof was placed upon the top. It had a door without a lock, but no windows, and was not lathed or plastered. It had no chimney, nor was a place provided for one. The structure was never occupied, and Simmons, the complainant, stated that

98 F.—49

he never saw it, and that it was not intended for human habitation. There is no evidence that it was ever occupied for any purpose. It remained upon the premises, so far as the record shows, not later than the autumn of the same year. It was not there in the year 1892, and there is no evidence of what became of it. On June 17, 1898, a decree was passed setting aside the tax deed, and holding it void, and requiring that it should be delivered up to be canceled, and requiring the complainant to pay all taxes which had been paid by Jackson or his grantors, and quieting the title to the premises in the complainant; from which decree this appeal is taken. Subsequent to the appeal, Charles E. Simmons departed this life, and by order of this court his representatives were substituted in his stead.

William Meade Fletcher, for appellant.
Homer Cooke and Edwin C. Crawford, for appellee.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

JENKINS, Circuit Judge, after the foregoing statement of the case, delivered the opinion of the court.

The question which first confronts us has respect to the right of the complainant below to maintain his bill. Originally, the jurisdiction in equity to entertain suits to quiet title was, as stated by Mr. Pomeroy (Eq. Jur. p. 2142):

"The equity jurisprudence to quiet title, independent of statute, was only invoked by a plaintiff in possession holding the legal title, when successive actions at law, all of which had failed, were brought against him by a single person out of possession, or when many persons asserted equitable titles against the plaintiff in possession holding the legal or an equitable title."

This limited jurisdiction has been much enlarged in many of the states of this country, and the federal courts sitting respectively within the respective states will exercise the enlarged jurisdiction which the statute of the particular state has tacked upon the ancient jurisdiction. Such legislation, as Mr. Pomeroy observes, may be divided into two classes,—the one requiring the complainant to be in actual possession; the other permitting such suit by one claiming title irrespective of possession. The statute of Illinois (1 Starr & C. Ann. Ill. St. 1896, p. 604, c. 22, § 50) falls within the former class, except that the suit is also allowed where the land is unimproved and unoccupied. This statute has received construction by the supreme court of Illinois in Gage v. Abbott, 99 Ill. 366, where this language is used:

"Under the old chancery practice, to maintain a bill to remove a cloud from a title it was essential that the complainant should be in, and the party against whom the bill was filed out of, possession. * * * But this is changed by the act of 1869, which allows such a bill to be filed 'whether the lands in controversy are improved or occupied, or unimproved or unoccupied.' Since that enactment we have held that there are only two cases under our law in which a party may file a bill to quiet title or to remove a cloud from the title to real property: First, where he is in possession of the lands; and, second, where he claims to be the owner, and the lands in controversy are unimproved and unoccupied. * * * In cases, therefore, where the lands are improved, and occupied by the adverse party, this remedy does not apply. In such a case the remedy would be by ejectment."

It was, therefore, obviously necessary for the complainant below to show to the court by his bill and proofs either that he was in

the actual possession of the premises claimed, or that they were unoccupied. This was essential to entitle him to invoke the equitable jurisdiction of the court, and so it is charged in the bill that, ever since receiving the deed from Darling,—April 21, 1891,—the complainant "has been, and is now, in the actual possession thereof." What shall constitute possession depends largely upon the character of the land claimed to be occupied, and the use to which it may be devoted, and the circumstances are as varying as are the different natures of property. The possession, however, must be actual and bona fide. It must evidence the exercise of dominion over the property, clearly referable to him who asserts the dominion, and which declares to the world the act and fact of dominion and the claimant of that dominion. It must not be pretentious or sham; it must be real, exhibiting a purpose to possess and to hold possession. Does the occupancy asserted by the complainant below fill the measure of these requirements? At the time of the deed from Darling, he knew of the tax deed to Lincoln, and that the appellant, Jackson, claimed title thereunder adversely to him. He also knew that both Lincoln and Jackson claimed that actual possession had been taken of the premises by Lincoln under color of title founded on the tax deed, and after payment by him of taxes for seven consecutive years. This is evidenced by the stipulation of the complainant below of even date with the deed of Darling, by which he agrees to bring suit against Jackson within 60 days to test the question of the claimed possession by Lincoln and Jackson. In March, 1891, intermediate the deed from Butters and the deed from Darling, and when he fully understood the claims of Jackson as to title and possession, he caused a structure to be placed upon the easterly portion of this land, and upon the part subject to be overflowed by the waters of the lake. The act was unique, as well with respect to the character of the structure as to the utter absence of use to which it could be devoted. The structure was made by men who were not carpenters. It was made of rough boards and scantling, and was 8 or 10 feet square, and presumably of the same height, with a flat roof of light material. The record does not inform us whether the building had a floor. The scantling were laid upon small stones at the four corners resting upon the sand of the beach. The structure had no window and no chimney, nor provision for any. It had a door, but, with Arcadian simplicity and unbounded confidence in the honesty of the good people of Waukegan, no means of fastening it was supplied. The structure was neither lathed nor plastered. For what use this structure was designed we are not informed by the record. The complainant could not or would not tell, but with charming naiveté he, perhaps rashly, conceded that it was not intended for human habitation. It could not have been intended as a refuge for stock, or the door would not have been provided; and the complainant was the land commissioner of a railway company, and not a stock raiser, or the owner, so far as the record discloses, of the small number of animals that could be accommodated within the precincts of the hut. The complainant never saw it during or after its construction, and upon his examination

could only say that it cost under $100; which sum manifestly would be an extravagant price. We can conceive of no use to which this structure could be devoted, unless possibly a fanciful benevolent use. It may be that, touched by the inspired flights of poetic genius, the complainant erected the structure that a sight of it might revive the drooping heart of Mr. Longfellow's "forlorn and shipwrecked brother." Whatever its purpose, he builded not wisely or well. Like the foolish man in the Scriptures, he builded his house upon the sand, "and the rain descended, and the floods came, and the winds blew, and beat upon that house, and it fell; and great was the fall of it." The structure remained until the early days of the autumn following its erection, a lonely hut upon a dreary waste. It was then lost to view, and the place that once knew it shall know it no more forever. Either the autumn storms and the angry waves of Lake Michigan carried it out to sea, where it floats a hopeless derelict, or the fierce blasts of winter beat upon it, broke it down, and scattered the fragments to the four winds of heaven, without a scantling left to tell the tale. We cannot regard the construction of this hut, under the circumstances, as evidence of actual occupation. It never was occupied. It manifestly was not intended to be occupied. It was abandoned so soon as completed. The real intention clearly was at trifling cost to place upon this beach something that a court of equity might receive as sufficient evidence of actual possession to sustain a bill to quiet the title. But equity deals with the real, not the fanciful; with actual rights in property, not with pretensions to right. It looks through form to find the substance. It penetrates disguise to discover the real intention. It does not protect long-abandoned claims to property upon late, sham, and pretentious acts asserted as evidence of ownership, and made solely in anticipation and for the purpose of litigation. Equity is here invoked to exercise its jurisdiction in protection of the title asserted by the complainant, and upon the ground of actual possession of the premises by him. There was no such actual possession by him, nor was any intended. There was no public assertion of ownership. The act done was false and sham, and with knowledge of the prior possession claimed by Lincoln and Jackson. The building of the structure was a mere device upon which it was hoped the jurisdiction of a court of equity could be upheld. No real or actual occupancy was contemplated, and equity will not assume jurisdiction in the absence of actual possession evidencing designed and present dominion of the land. We are supported in our conclusion by a somewhat similar case decided in the supreme court of California, which meets with our hearty approval. De Frieze v. Quint, 94 Cal. 653, 664, 30 Pac. 3. There the court, speaking of a like act of occupancy, observes:

"The little shed, sufficient 'to afford shelter to three valuable domestic animals,' ten feet square and seven feet high, is the only thing relied upon to indicate to defendant that plaintiff or Miller was in possession of the land; and no doubt it was intended to be used as evidence of such possession, and for no other purpose. So important was it considered by the complainant that the only visit that he made to the land during the term of the lease was for the purpose of ascertaining whether Miller had built it according to the cove-

nants in the lease. Why was this shed required to be sufficient to shelter only three valuable animals? Why is there no evidence that it was ever used for any purpose? It was obviously a mere sham, which should be allowed no effect whatever as evidence of possession."

Nor can the complainant below, his actual occupancy failing, be heard to say that his bill can be sustained within the statute upon the ground that the premises were "vacant and unoccupied." Having asserted, by his bill, actual occupancy by himself, he must sustain that allegation, or fail in his suit. He cannot now shift his position. Glos v. Bouton, 170 Ill. 249, 48 N. E. 949. We are the less inclined to give weight to the supposed act of occupancy from consideration of the circumstances under which the complainant below appeals to a court of equity. The owners of the land for a period of 22 years paid no heed or attention to the property, and discharged none of the duties which they owed to the government which protected them and their rights in the property. They knew—as all men know—that an annual tax is laid upon all property for the support of the government. They allowed strangers to the title to pay the taxes during 22 consecutive years, and to acquire a tax title to the premises. They doubtless deemed the property worthless,—as probably it was,—except for purposes of a fishery, until about the year 1891, when, within common knowledge, a considerable demand arose for sand, and property along the beach of the lake sprang into value. Then the complainant acquired from former owners the title to these 70 acres of land, placed this structure upon the premises, and forthwith filed his bill to avoid the tax deed under color of title of which Lincoln and Jackson claimed to have taken possession. The facts, although not conclusive, are somewhat strong to show an abandonment by the complainant's grantors of their rights in the property. Holtzman v. Douglas, 168 U. S. 278, 284, 18 Sup. Ct. 65, 42 L. Ed. 466. And we are not inclined to dispense with the actual occupancy which the law requires in favor of those who for so long a period of time have lost sight of their duty to the government which protects them in their rights of property. We conclude, therefore, upon this branch of the case, that no actual occupancy by the complainant was shown, and that his bill should have been dismissed.

It remains to consider the rights of the appellant under his cross bill. Undoubtedly, where a cross bill is filed for the purposes of a discovery, or to bring before the court matters of defense occurring since the commencement of the suit,—equivalent at law to a plea puis darrein continuance,—it is not essential to show equitable grounds for the interposition of the court. The cross bill in such case, being purely in aid of the defense asserted to the original bill, is dependent upon, and probably falls with the dismissal of the original bill. But a cross bill which seeks affirmative relief is in the nature of an original bill wherein the cross complainant is the actor. Such a cross bill is not dependent upon the original bill, is not subject to the control of the complainant in the original bill, and does not fall with the dismissal of the original bill, whether that dismissal be the act of the complainant or the act of the court. Therefore the cross complainant appealing to a court of equity for equitable relief

touching a subject germane to the matter of the original bill must present to the court the grounds for the affirmative relief with the same care and particularity as are required in an original bill, and must make a case by his bill of which the equitable jurisdiction will take cognizance. Thus it has been held that a cross complainant charging usury with respect to securities which are the subject-matter of the original bill, and seeking to have them delivered up and canceled, must, in order to bring himself within equitable cognizance, offer to pay what is legally due upon them. Mason v. Gardiner, 4 Brown, Ch. 437. See, also, Story, Eq. Pl. (10th Ed.) § 398; 2 Barb. Ch. Prac. c. 9. Has the appellant (the cross complainant) presented by his cross bill a case for equitable cognizance? We have shown in the discussion of the complainant's case that, under the enlarged jurisdiction which courts of equity will exercise since the passage of the statute by the state of Illinois, courts of equity will entertain jurisdiction to remove a cloud upon a title in two cases only,—where the complainant is in possession of the land, or where the premises are vacant and unoccupied,—and that one of these two conditions must obtain, and be shown by the bill, before the interference of equity can be successfully invoked. In this respect the cross bill stands upon the same footing, and is to be judged by the same considerations, which govern an original bill. The cross bill in this case charges that Lincoln obtained his tax deed in 1872, the land being then vacant and unoccupied; that for 18 consecutive years thereafter Lincoln paid the taxes upon the land, and that, subsequent to the year 1879, Lincoln, under color of title, "took possession of said premises, and was in possession of the same from said last-mentioned date to the time of his death, to wit, on the 25th day of May, 1889, or thereabout; and that at the time of the taking of the possession of the said premises by the said Oliver S. Lincoln, deceased, the same were vacant and unoccupied." The bill may possibly be defective in the omission to state whether during the period from 1872 to the taking possession by Lincoln the lands were vacant and unoccupied, and in the omission to state with particularity the character of the possession taken. These defects, however, if they be defects, we pass by, because they do not go to the question of equitable cognizance. The bill, however, wholly fails to declare whether possession was continued after the death of Lincoln, and whether the lands at the time of the suit were possessed, and by whom, or were vacant and unoccupied; and wholly fails in any assertion that the appellant was in possession. Without apt allegations in this respect, equity will not, as we have shown above, entertain a suit to remove a cloud upon title. The cross complainant appealing for equitable interference must, by his cross bill, bring himself within the recognized principles upon which courts of equity act. Thus, in Calverley v. Williams, 1 Ves. Jr. 210, the complainant asserted that a certain parcel of copyhold land was included within a larger parcel of lands sold to him by the defendant, and the complainant had in some manner been let into the possession of the parcel in dispute, which it was claimed by the defendant was not included in the sale. Thereupon Calverley filed his bill to compel a conveyance to him by the defend-

ant of the land in dispute. The defendant, having answered denying the sale, filed his cross bill seeking to recover from Calverley the possession of the land in question. The original bill at the hearing was dismissed upon the merits, and with reference to the cross bill Lord Thurlow observes: "As to the cross bill to be let into possession, I cannot decree; that it is merely a legal title, and the object of ejectment, therefore it must be dismissed, with costs." The cross bill failed to show a case within the equitable jurisdiction of the high court of chancery of England, then obtaining. It was, therefore, dismissed, although its subject was germane to the subject-matter of the original bill, and although the jurisdiction of a court of equity over the original bill was incontestable and undisputed. It is thus clear, to our thinking, that whoever appeals to a court of equity for affirmative relief—whether he be complainant or cross complainant—must, by his bill, exhibit a case that falls within recognized principles of equitable cognizance, and that as here the appellant does not show by his cross bill that at the time of the suit he was in possession of the land, or that the land was at that time vacant and unoccupied, he has not, by his bill, exhibited a case upon which a court of equity can afford him affirmative relief. But, were this otherwise, the evidence is so loose and fragmentary with respect to the occupancy of the land covered by the tax deed that we should hesitate to decree the relief demanded. It is claimed that east of the premises embraced within the tax deed there is a parcel of land described in the original bill as "a fraction lying east of the above-described premises." The width of this fraction of land, if any such there be, is not given, and the eastern boundary of the N. W. ¼ of the N. E. ¼ of the section is nowhere stated with precision. Although the premises would appear to have been surveyed upon several occasions, the parties seemed not to have deemed it necessary to call as witnesses those who made the survey, but to have contented themselves with loose and disconnected statements which the surveyors are said to have made. It is, therefore, impossible for us to ascertain whether, assuming the occupancy of Gamash, the fisherman, under the license of Lincoln, to be such possession as the law required, it in fact extended westerly from the shore of the lake to and upon the land actually included within the N. W. ¼ of the N. E. ¼ of the section, or whether it was confined within the limits of the parcel described as the fraction lying easterly thereof. We should therefore hesitate to say that the possession by Lincoln was shown with that accuracy which we deem to be necessary.

Neither party having brought himself within equitable cognizance each must be remanded to his remedy at law. The decree will be reversed, and the cause remanded, with directions to the court below to enter decrees dismissing both the original and the cross bills.