CUMMINGS, Atty. Gen., et al. v. ISENBERG.

No. 6684.

United States Court of Appeals for the District of Columbia.

Argued Dec. 10, 11, 1936.

Decided Feb. 1, 1937.

490

James W. Morris, Asst. Atty. Gen., and Harry L. Jones, Frederick L. Smith, and Richard J. Connor, Attys., Department of Justice, all of Washington, D. C., for appellants.

George W. Hott and Reuben D. Silliman, both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, and GRONER, Associate Justices.

### GRONER, J.

This is a suit begun by Richard M. Isenberg (appellee) under section 9 of the Trading With the Enemy Act, as amended (50 U.S.C.A. Appendix § 9), against the Alien Property Custodian and the Treasurer of the United States, to recover approximately $67,000, the balance of the proceeds of property which had been seized by the Custodian in January, 1918. There was a decree below for appellee.

Appellee had already claimed, and there had been returned to him, the portions of the property returnable under the provisions of the Winslow Act (42 Stat. 1511) and under the Settlement of War Claims Act (Act March 10, 1928, 45 Stat. 270–273). He now claims that he was and is an American citizen and as such is suing for the 20 per cent. of his property retained under the provisions of the last-mentioned act (section 9 (m), Trading with the Enemy Act, as added by Act March 10, 1928, § 14, 50 U.S.C.A. Appendix § 9 (m). The foundation of the claim is that appellee's father was from 1874 to the date of death in 1903 a naturalized subject and citizen of Hawaii; that appellee, though born in Germany in 1880, acquired his father's nationality and thus himself became a citizen of Hawaii, was a citizen of Hawaii on August 12, 1898, and was thereafter a citizen of the United States under the provisions of the Hawaiian Organic Act of 1900.[1]

A condensed preliminary statement of facts will be helpful. Appellee's father, Paul Isenberg, was born in the Kingdom of Hanover (his date of birth does not appear). In 1858 he went to Hawaii and remained there continuously except for brief visits abroad (during one of which, in 1899, it is contended he was naturalized and received into the citizenship of Bremen) until 1901 when, because of his health, he returned to Europe and died in Bremen in 1903. In 1869 he married in Bremen, and immediately thereafter he and his wife, Beta, went to the Hawaiian Islands, where they continued to reside until their permanent return to Germany in 1901. Mrs. Isenberg died in Germany in 1932. Apparently she continued to reside wholly in Germany after her husband's death. In 1874 appellee's father became naturalized as a citizen of the Kingdom of Hawaii, and on the same day was made a noble and served in the House of Nobles continuously thereafter for some twelve or fourteen years. Appellee was born in Bremen in 1880. He lived there until he was nineteen years of age, when he went to Hawaii and was employed on his father's sugar plantation for six months, and then returned to Germany to complete his education for the Hawaiian sugar industry. Some two or three years later he returned to Hawaii and remained there for two years, during which time he was employed as manager of a plantation belonging to a corporation in which his father had a large interest. Then he returned to Germany,

---

[1] 31 Stat. 141, § 4 (48 U.S.C.A. § 494).

where he remained for a year and a half and where, in 1906, he was married. After his marriage, he returned to Hawaii with his wife and for two years continued to be occupied in the sugar business there, and then on account of his wife's health he went back to Germany, and from 1909 to the present time he has continued to reside on a farm in Mecklenberg in Germany which he acquired there in that year. Appellee testified that in 1910 he desired to return to Hawaii but was unable to do so because of an operation for appendicitis, and after his recovery in 1911, acting on the advice of his cousin, he remained in Germany until the war began in 1914. Appellee did not serve in the German army during the war, but did serve in the German Red Cross until American entry. He did not register during the war as an American citizen either before or after American participation, and none of his property in Germany was taken over by the German custodian. In 1918 the American custodian seized his Hawaiian property, and in 1923 appellee filed a claim for the return of $10,000 under the Winslow Act (42 Stat. 1511). In this claim he reserved the right to claim and establish American citizenship, and in 1928 he filed a further claim for 80 per cent. of the balance of his property under the Settlement of War Claims Act, and in his application stated that "he is now and since April 6, 1916, has been a resident and classed as a citizen of Germany."

The Attorney General denies that appellee ever was an American citizen, but says that, if this point be decided against him, appellee lost his citizenship, first, by reason of the fact that his father, through whom he claims, became a naturalized citizen of Bremen, Germany, in 1899, when appellee was nineteen years old; and, if this point be decided against him, then, second, by expatriation under the Act of March 2, 1907,[2] read in association with section 21 of the Trading with the Enemy Act (Act March 4, 1923, § 2, 42 Stat. 1516 [50 U.S.C.A. Appendix § 21]).

We shall discuss these propositions of the Attorney General in the order in which we have stated them.

First. Was appellee born a citizen of Hawaii?

It is admitted that appellee's father became a naturalized citizen of Hawaii in 1874 and that when appellee was born (1880) his father then maintained a permanent residence in the Hawaiian Islands. But appellee was not born in the Hawaiian Islands—he was born in Germany. And this brings us to the question whether in the circumstances he acquired Hawaiian citizenship. The answer involves an examination of the Hawaiian laws.

Hawaii was discovered by Capt. James Cook in 1778 and was then a feudal monarchy. American missionaries were introduced into the islands around 1820, and two or three years later the first written or printed law was issued. A constitution was adopted in 1840; the first compilation of laws was published in 1842; and in 1846–7 a comprehensive code of laws was enacted, which in turn was supplanted by a new civil code adopted in 1859. Our attention has been directed to a statute passed in 1846 conferring citizenship in the kingdom upon foreign-born children of a parent native of the kingdom, reading as follows: "All persons born within the jurisdiction of this kingdom, whether of alien foreigners, of naturalized or of native parents, and all persons born abroad of a parent native of this kingdom, and afterwards coming to reside in this, shall be deemed to owe native allegiance to His Majesty," etc.

But this statute was repealed by the civil code of 1859 and, so far as we are able to determine, no similar statute was enacted either during the monarchy or the provisional government or republic which succeeded it. The code of 1859 continued in force from its enactment until after appellee's birth in 1880, but it contains no similar provision to that quoted above and the only clause which seems to throw any light upon this disputed question is section 823, which reads: "The several courts may cite and adopt the reasonings and principles of the admiralty, maritime, and common law of other countries, and also of the Roman or civil law, so far as the same may be founded in justice, and not in conflict with the laws and customs of this kingdom."

It is very likely that this provision was adopted in deference to the fact that the new population of the islands was heterogeneous and embraced settlers from both common law and civil law nations. However that may be, the subsequent court rec-

---

[2] 34 Stat. 1228, § 2 (8 U.S.C.A. § 17).

ords of trials appear to demonstrate that the common law rather than the civil law was most frequently applied.

On the strength of this the Attorney General urges that, in the absence of any positive holding on the precise question, it is more reasonable to assume that the Hawaiian courts, if it had arisen, would have applied the common law rule, i. e., the place of nativity, rather than the civil law rule, i. e., the fact of filialism, in its determination of the question.[3] On the other hand, appellee insists that the Hawaiian courts frequently declined to apply the common law in cases involving property rights as well as in other classes of cases, and that therefore no fair conclusion may be drawn one way or the other from the optional provisions of the statute. And, failing anything conclusive in this respect, he relies largely upon an opinion said to have been given by the Hawaiian Minister of the Interior in 1868 to the effect that Hawaiian citizenship depended upon birth in the kingdom or birth abroad of Hawaiian parents, either native or naturalized, during their temporary absence from the kingdom. This opinion is quoted in the case of Wong Foong v. United States (C.C.A.) 69 F.(2d) 681. That case involved the citizenship of a Chinese born in China, but whose father was a naturalized citizen of the Kingdom of Hawaii. The case itself is not in point, for the reason that Wong Foong was born after the monarchy had been overthrown and a constitution adopted (1894), under the provisions of which the common law was declared to be the applicable law of the new republic. But the opinion states that the attention of the court had been called to a decision of the United States District Court for the Territory of Hawaii in the case of Lum Yuk Kwai which contained correspondence said to have been published in the newspaper Pacific Commercial Advertiser January 25, 1868, between one H. H. Parker and Fred W. Hutchison, the Minister of the Interior of the Hawaiian Islands. Parker apparently had written to the Minister inquiring as to his citizenship status. He said he was born in 1834 in one of the Marquesas Islands; that his parents were temporarily there on a mission; that his father was a citizen of the United States and he himself had come to the Hawaiian Islands with his mother when he was two months old and had resided there over thirty years but had never taken the oath of allegiance to the government. In his reply the Minister is reported to have said: "In the judgment of His Majesty's government, no one acquires citizenship in this Kingdom unless he is born here, or born abroad of Hawaiian parents (either native or naturalized), during their temporary absence from the Kingdom," etc.

If we accept this newspaper report as an official interpretation of the law, no more need be said on this subject, for appellee's case would come well within its terms. But its source leaves much to be desired, and it is difficult to understand why its verity could not have been set at rest by some decided case or some official pronouncement to be found in the Hawaiian archives. In these' circumstances we should be slow to rest our decision on this uncertain foundation. "Citizenship is a high privilege, and when doubts exist concerning a grant of it, generally at least, they should be resolved in favor of the United States and against the claimant." United States v. Manzi, 276 U.S. 463, 467, 48 S.Ct. 328, 329, 72 L.Ed. 654. In this view we are confronted by a complete dearth of binding authority on the question whether the common law or the civil law doctrine must be applied and by a lack of

---

[3] If the common law rule applied, appellee would not have acquired at birth Hawaiian citizenship. But on the contrary he would have if the civil law rule was the test: The Supreme Court has examined the history of the two diverse rules at great length in the case of United States v. Wong Kim Ark, 169 U.S. 649, 18 S.Ct. 456, 477, 42 L.Ed. 890, and reference is made to that opinion for a full discussion of the question.

But see, also, Dr. Arnold's (Rugby) miscellaneous writings—Article Christian Politics, p. 465; 1 Wallon L'Esclavage daus L'Antiquite 159; 1 Gibbons' Hist., p. 45; 2 Gib. 158; 2 Revue de Droit. Internat. et de leg. Comp. 107. These authorities agree that among ancient commonwealths citizenship depended upon and was derivable from race. On the contrary, in England under the common law every person born in the Kingdom became a subject owing allegiance to the Sovereign. See, also, in relation to United States citizenship prior to the Fourteenth Amendment, the separate opinions of Chief Justice Taney and Justice Curtis in Scott v. Sandford, 19 How. 393, 15 L.Ed. 691.

satisfactory proof whether, as an alternative, there was, as is claimed for the opinion of the Minister, an established custom, amounting to governmental regulation, determinative of the status of a child born abroad of naturalized parents of the Kingdom of Hawaii.

But, as we think the case may be decided without regard to these questions, we pass them by without any further expression of opinion.

The second main question involves the defense that, whatever appellee's original citizenship status, he later became a citizen of the German Empire. As we have seen already, the elder Isenberg continued to reside in Hawaii until 1901, but in 1899, presumably while on a visit to Germany, he was naturalized and received into the citizenship of Bremen. The Attorney General on the hearing below introduced in evidence a duly certified document entitled "Certificate of Naturalization" dated April 12, 1899, issued by the free city of Bremen to Paul Isenberg and evidencing the fact that he, his wife and two children, including appellee, were that day received into the citizenship of Bremen. Nothing more than the document itself appears in evidence. At the time of the hearing below, Paul Isenberg had been dead for approximately thirty years, and appellee, who was at the time of the Bremen proceedings nineteen years of age, throws no light upon the subject.

Dr. Grossman, an international lawyer of repute, was called as a witness for appellee to testify in relation to the German law of citizenship and expatriation. In the course of his examination he testified that citizens of Bremen in 1866 became citizens of Prussia, and in the same year Prussians became North Germans, and in 1871 citizens of the German Empire. He further testified that as of 1899 federal citizenship law of Germany provided that foreigners could become German nationals by being naturalized in a German state; that the process of naturalization differed in the various states, and in some states the applicant was required to show that he was at liberty to expatriate himself, and in some an oath of allegiance was necessary, and in others it was not, and that he could not state whether or not an oath of loyalty, etc., was required in Bremen; that in the latter place the applicant was not required to renounce his former citizenship; and that it was the general German law

that the naturalization of the male parent automatically naturalized his wife and their minor children of whom he had custody. He, however, announced his opinion to be that the naturalization in Bremen of the elder Isenberg would have been ineffective to change his citizenship—and also, of course, that of appellee—for the reason that Hawaii, as he assumed, did not permit expatriation. The reason is not convincing, first, because no Hawaiian law is cited to show that expatriation was forbidden, unless indeed it be conceded that the old English rule—once a subject always a subject—applied, and there is no support for that; and, second, even if it should be held to apply, it would not overcome the universal rule that every independent state has the right to naturalize a citizen of another country without regard to the municipal law of that country and that naturalization so extended will continue as long as the citizen remains in the country of naturalization, or the American rule, which goes even farther, and which recognizes and insists upon the inherent right of naturalization and protects the naturalized person both within and without the territory of the United States. Wong Kim Ark Case, supra. And it should be remembered that in 1899 the Hawaiian government had surrendered (in 1898) its sovereignty to the United States.

The testimony of Dr. Grossman as to the effect on appellee of his father's naturalization—if the certificate be accepted at face value—and its effect in establishing citizenship in the German Empire, is amply sustained by such authorities as we have been able to find, particularly Webster, Law of Naturalization (1895), at page 188, and Moore's International Law Digest, vol. 3, pp. 573 and 603.

Stated shortly, therefore, we have a case in which the father of appellee, after living many years in Hawaii, in his declining years returned to Germany—his native land—and was accorded a certificate of naturalization in the usual form and who, two years later, left Hawaii finally to return to Germany and die where he was born. Appellee, as has been pointed out, was at the time of the grant of naturalization nineteen years of age, then a resident of Bremen where he had lived from birth, and under the custody of his father; and supplementing this is the fact that his mother, after his father's death, continued to reside in Germany until her death.

When to these facts is added the further fact that during the World War, and particularly the participation by the United States, none of the family was required—as were other American citizens then in Germany—to register as American citizens or be subjected to the pains and penalties incident to the residence of alien enemies in Germany during that period, it would not be going very far to say that this act of the father was done not only with the deliberate purpose to change his citizenship and that of the infant members of his household, but that it had this effect. And the latter conclusion is strengthened rather than weakened by the well-known rule that it is the duty of a court to give effect to the proved official acts of the officers of government in those matters in which they have jurisdiction. Here the proceedings of naturalization in accordance with the laws of Germany were duly had. To deny them effect would be contrary to every rule. But, in addition to all that has been said, we think there is another conclusive answer to appellee's petition, and that this answer is to be found in the words in the statutes of the United States. And this brings us to the third point.

The question is: Did appellee, conceding his Hawaiian citizenship and putting aside the Bremen naturalization proceedings, lose that citizenship by expatriation under the provisions of section 2 of the Act of March 2, 1907, and section 21 of the Trading with the Enemy Act? The second paragraph of section 2 of the Act of March 2, 1907, is as follows: "When any naturalized citizen shall have resided for two years in the foreign State from which he came, or for five years in any other foreign State it shall be presumed that he has ceased to be an American citizen, and the place of his general abode shall be deemed his place of residence during said years. Provided, however, That such presumption may be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer of the United States, under such rules and regulations as the Department of State may prescribe."

Section 21 of the Trading With the Enemy Act provides: "The claim of any naturalized American citizen under the provisions of this Act shall not be denied on the ground of any presumption of expatriation which has arisen against him, under the second sentence of section 2 of the Act entitled 'An Act in reference to the expatriation of citizens and their protection abroad,' approved March 2, 1907 (§§ 16, 17 of Title 8 Aliens and Citizenship) if he shall give satisfactory evidence to the President, or the court, as the case may be, of his uninterrupted loyalty to the United States during his absence, and that he has returned to the United States, or that he, although desiring to return, has been prevented from so returning by circumstances beyond his control."

Appellee denies the applicability of these statutes on the ground that he is not a naturalized citizen of the United States, but that by applying the law as stated by the Minister of the Interior—which he insists was the applicable law in Hawaii at the time of his birth—he became, by reason of being born abroad of naturalized citizens of Hawaii, a native-born citizen of that kingdom, and that, being a native-born citizen of Hawaii, he became a native-born citizen of the United States by the Hawaiian Organic Act of 1900. In short, that the provisions of the sections in question have no applicability to him because he is not now, and never was, a naturalized citizen of the United States. The necessary effect of his position is to place collectively naturalized citizens on the same basis as native-born citizens; in other words, to differentiate the status of those naturalized by special act of Congress from the status of those naturalized by the ordinary court procedure established by Congress. But we think this position cannot be sustained. Whether an alien individually comes to this country and assumes the status of citizen, or whether by the acts of their representatives a whole group of aliens annex themselves to this country and take on the status of citizens, is in our view wholly immaterial, for in either case their subsequent status is that of naturalized citizens. In the United States there are but two kinds of citizenship, one acquired by birth in the country and the other by naturalization as provided by law. That is the language of the Supreme Court in the Wong Kim Ark Case: "The fourteenth amendment of the constitution, in the declaration that 'all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside,' contemplates two sources of citizenship, and two only,—birth and naturalization. Citizenship by natur-

alization can only be acquired by naturalization under the authority and in the forms of law. But citizenship by birth is established by the mere fact of birth under the circumstances defined in the constitution. Every person born in the United States, and subject to the jurisdiction thereof, becomes at once a citizen of the United States, and needs no naturalization. A person born out of the jurisdiction of the United States can only become a citizen by being naturalized, either by treaty, as in the case of the annexation of foreign territory, or by authority of congress, exercised either by declaring certain classes of persons to be citizens, as in the enactments conferring citizenship upon foreign-born children of citizens, or by enabling foreigners individually to become citizens by proceedings in the judicial tribunals, as in the ordinary provisions of the naturalization acts."

Appellee was not born in the United States, but in Germany. He is not, therefore, a native-born citizen and, if he is a citizen at all, it can only be by virtue of naturalization in one or the other of the forms provided by law; that is to say, by proceeding in a judicial tribunal, by special act of Congress, or by treaty, etc. In view of the positive declaration of the Supreme Court on the subject, it would be a waste of time to pursue this phase of the question further. And so we hold that, even if we concede—which we are far from doing—that appellee is a citizen of the United States, he is a naturalized citizen, and as such within the intendment of the provisions of the two acts of Congress to which we have referred. And this brings us to consider whether or not appellee has overcome the statutory presumption of expatriation by furnishing satisfactory evidence that he has returned to the United States or that, desiring to return, he has been prevented by circumstances beyond his control.

Appellee has never resided in the continental United States. He was born in Germany and lived there until he was nineteen years of age. Thereafter he spent, at intervals, approximately four years in Hawaii, going and returning via Japan rather than the United States. In 1909 he left the Hawaiian Islands and returned to Germany and purchased a farm and has continued to reside on that farm from that date to the time he commenced this suit—many times the five-year period of limitation prescribed by the statute. During the war period he did not register with the German authorities as a citizen of the United States, and from this fact we should, perhaps, infer that he neither claimed to be nor held himself out as an American citizen, because we must take notice of the historical fact that American citizens after the entry of the United States into the war were required to register and were subject to have their property seized by the German property custodian. All of this we mention by way of showing what we think obviously was appellee's own position on this question; but, without regard to this or to his conduct during the war, and assuming that he was at all times loyal to the United States, he was—and this is the vital factor in the question—after the termination of hostilities and the establishment of peace in 1921 (42 Stat. 105), free to come to the United States or to go to Hawaii and establish a domicile if he had been so minded—instead of which he continued to reside in Germany until January 1931, at which time he spent one month in the United States traveling on a passport issued to him as a German citizen. As a German citizen (though reserving the right to claim American citizenship) he obtained back a portion of his seized property under the Winslow Act and likewise as a German citizen he received the larger part under the Settlement of War Claims Act, and under the provisions of the latter act agreed to surrender 20 per cent. to a fund created for protection and payment of American nationals' claims against Germany. In 1933 he made application to the American consul at Hamburg for registration as an American citizen. One, at least, of the purposes of this application was to aid him in establishing the pending claim before the Alien Property Custodian, and in this application he stated under oath, "I do not intend to return to the United States permanently to reside"; and a little later on the advice of counsel he withdrew his application entirely. In 1935 appellee again came to the United States in connection with the present litigation, traveling on a passport issued to him by the German government as a German national. And on his baggage declaration he declared himself to be a citizen of Germany then resident in Germany.

In short, from beginning to end there is not a shred of evidence that appellee ever

had resided in the continental United States or that he intends now to reside here, but, on the contrary, the uncontradicted sequence of events shows conclusively that at no time did he intend to make this country his permanent home. And equally is there no evidence that he intends to return to Hawaii, or, what is more to the point, that he has returned there with the purpose of making it his permanent home. And, of course, there is evidence that he has not returned.

In this aspect we have no occasion to consider whether the act of 1907 is, as has been sometimes said, a statute for the convenience of the State Department in cases of persons residing abroad and seeking protection from this government. Whatever it may or may not be in that respect, it certainly creates a presumption of expatriation in the case of every naturalized citizen absenting himself from the United States for the period of at least five years, and the subsequent war statute requires that presumption to be rebutted by satisfactory evidence to justify a suit for the return of seized alien property; and, unless and until that presumption is overcome, there is a total lack of jurisdiction in any court to award a recovery. The question is not new, but was discussed and decided by us in Thorsch v. Miller, 55 App. D.C. 295, 5 F.(2d) 118, 120, appeal dismissed 274 U.S. 763, 47 S.Ct. 577, 71 L.Ed. 1318. There Thorsch sought recovery of property held by the Custodian. He claimed he was a naturalized citizen having come to this country from Austria. The Custodian denied his citizenship. It appeared that Thorsch was born in Austria and came to this country in 1894 and was naturalized in 1898. He amassed a fortune and returned to Austria in 1912, where he and his family continued to reside up to the time of the suit (1924). At the beginning of the war he became vice-consul of the United States at Vienna, resigning when this country severed diplomatic relations with Austria. During our participation in the war Thorsch was not interned, his property was not sequestered, and he continued unrestrictedly to do business in Vienna,—conditions in all respects like those which surrounded appellee. At the time of the suit, as we have seen, he was still residing in Austria, and at no time had returned to this country. "These facts," we said, "bring Mr. Thorsch within the limitations of section 21, Act of March 4, 1923, supra, and prevent him from recovering as a naturalized American citizen in this suit; for he had resided for two years in the foreign state from which he came, and consequently could not recover against the Custodian without first giving satisfactory evidence to the court 'of his uninterrupted loyalty to the United States during his absence, and that he has returned to the United States, or that he, although desiring to return, has been prevented from so returning by circumstances beyond his control.' Mr. Thorsch has utterly failed to give any evidence of that character. It should be noted that these requirements are not mere rules of evidence for ascertaining whether a naturalized American citizen thus residing abroad had thereby intentionally expatriated himself." And, while we did not hold that Thorsch was not still a citizen of this country, we did hold that the presumption arose under the 1907 act and that the rebuttal of that presumption was a condition precedent to the maintenance of a suit for recovery of the property under the later act. Viewed in this aspect, the parallelism between the Thorsch Case and the case at hand is complete. Whether Thorsch did acts of hostility was beside the point. He could have done nothing at all and the presumption would still have arisen. We held that by the very terms of the statute he came into court under a disability, and that, this being a suit against the United States, and the United States being entitled to place their own conditions on the right to sue, the right could not be maintained without complying with those conditions.

From all that has been said it is obvious that we may sustain appellee's recovery only upon a series of assumptions, none of which, as we have pointed out, is sustained by satisfactory evidence. In saying this we are not unmindful that a contrary view has been expressed by the lower court in this and in a prior case involving a member of appellee's family and that the same view was taken by a former Attorney General in the claim of another of his family. But, with great deference, we are nevertheless constrained to hold that appellee has wholly failed to discharge the burden of proof of citizenship which our law imposes, Von Zedtwitz v. Sutherland, 58 App. D.C. 153, 26 F.(2d) 525, or to overcome the presumption created by the statutes we have last discussed.

The decree below is reversed, and the case remanded, with instructions to dismiss the bill.

Reversed.