**ISENBERG v. BIDDLE, Atty. Gen., et al.**
**No. 7747.**

United States Court of Appeals for the
District of Columbia.

Argued Nov. 4, 1941.

Decided Dec. 15, 1941.

Mr. Sherwood E. Silliman, of New York City with whom Messrs. Reuben D. Silliman, of New York City, and William R. Rodenberg, of Washington, D. C., were on the brief, for appellant.

Mr. Harry LeRoy Jones, Sp. Asst. to the Atty. Gen. with whom Mr. Francis M. Shea, Asst. Atty. Gen., and Messrs. Frederick Bernays Wiener, Sp. Asst. to Atty. Gen., and Frederick L. Smith, Attorney, Department of Justice, of Washington, D. C., were on the brief, for appellees.

Before GRONER, Chief Justice, and MILLER and EDGERTON, Associate Justices.

## GRONER, C. J.

This is an appeal from a final order of the District Court, dismissing appellant's complaint and granting summary judgment in favor of the United States on a counterclaim in the sum of $164,716.60, with interest. This appeal seeks only a reversal of the judgment on the counterclaim.

The facts are these. Appellant, whom we shall hereafter call Isenberg, was born in the Kingdom of Hawaii in 1870. Four years later his father, having acquired large property interests there, became a naturalized Hawaiian citizen. When he was eight years old, Isenberg was taken to Germany for his education and remained there uninterruptedly for twenty years. He then returned to Hawaii for a few months, went back to Germany, and never at any time thereafter again visited Hawaii. In January, 1890, he was naturalized as a citizen of Bremen. Since 1871, citizens of Bremen are also citizens of the German empire.[1] In 1895, having taken the oath of citizenship and completed his military service in Germany, he was commissioned a second lieutenant of reserves in the German army. At the beginning of the first World War he held a commission as captain and served at the Russian front with his regiment until 1916, when he returned to his farm in Holstein, Germany, to devote himself to its care and cultivation. At the time of American participation in the war, Isenberg owned stock in several Hawaiian corporations. His certificates were seized by the Alien Property Custodian and sold and the net proceeds deposited in the Treasury and identified by a trust number. After the passage of the Winslow Act,[2] Isenberg, claiming as a citizen and resident of Germany, applied for and received the part of the seized property permitted under that Act. In the latter part of that year (1923) he came to the United States on a German passport and stated in his visa application that he was a German. The following year, executing an affidavit in relation to certain shares of stock belonging to his mother, he again made oath that he was a citizen of Germany residing in Holstein. He made the same oath in 1927 in an affidavit filed on behalf of his brother-in-law's estate, and in the latter part of that same year came again to the United States on a German passport and again made oath that he was a German citizen. In 1927 he filed a claim with the Alien Property Custodian for the return of his property in which he stated under oath: "I have never taken an oath of allegiance to any state of Germany nor to the Imperial or any other German Government or subdivision thereof, or any other foreign country. I have made no application for citizenship in Germany or elsewhere and always regarded myself as an American citizen and have never forsworn allegiance to the Kingdom of Hawaii, the Republic of Hawaii, or the United States of America; and have never borne arms against the United States or any of

---

[1] Cummings v. Isenberg, 67 App.D.C. 17, 89 F.2d 489.

[2] March 4, 1923, 42 Stat. 1511, 50 U.S. C.A. Appendix, §§ 9, 20–24.

her Allies or Associates, but have at all times been loyal to the United States."

But after the passage of the War Claims Act[3] he withdrew the claim and, representing himself to be a resident of Germany, received 80 per cent of the remaining net proceeds. Again in 1928 and 1929 he returned to the United States on a German passport, and in 1930 executed and swore to a United States non-resident alien income tax return. The following year he revived his withdrawn claim to American citizenship and, declaring himself to have been at all times loyal, applied to the Alien Property Custodian for the remaining 20 per cent of the seized property. On the recommendation of the Attorney General—who was without knowledge of the sequence of events we have referred to—an Executive Order followed, as the result of which the balance of the trust was returned to him.

Not content with having got back the entire net proceeds of all of his seized property, Isenberg in 1936 brought the present suit to recover, under the provisions of the Fifth Amendment, just compensation for loss claimed to have been sustained through the sale of his property by the Custodian for less than its fair value. The United States, with leave of court, filed a counterclaim, demanding judgment for the difference between the sum Isenberg was paid as an American and the largest sum to which he would have been entitled as a German— in other words, the amount of the last 20 per cent payment, with interest. Summary judgment was asked on the counterclaim. Thereafter, upon the introduction in evidence of sundry depositions, affidavits, and exhibits, Judge Bailey ordered the complaint dismissed for "want of jurisdiction"[4] and judgment entered for the United States. In a short opinion the judge said, inter alia: "I think that 'the pleadings, depositions and admissions on file, together with the affidavits—show that—there is no genuine issue,' as to the fact that plaintiff was a German citizen and an alien enemy when his property was seized in 1918, that the Executive allowance granted him was obtained by fraud and that the defendant is entitled to the relief sought in the cross bill."

On this appeal, three points are argued: (1) That the District Court, having dismissed the complaint for lack of jurisdic-

tion, was without power to hear and determine the counterclaim; (2) that the court erred in granting the summary motion on the counterclaim; and (3) that the determination by the President that Isenberg was an American citizen was correct, but whether correct or not, is non-reviewable by any court. We think there is no merit in any of the three grounds.

■ As to the first, counsel insists that when the bill of complaint was dismissed, "the keystone of the District Court's jurisdiction fell and the counterclaim should have been dismissed with the bill". Moore v. New York Cotton Exch., 270 U.S. 593, 607-609, 46 S.Ct. 367, 70 L.Ed. 750, 45 A.L.R. 1370, and Kelleam et al. v. Maryland Casualty Co., 312 U.S. 377, 61 S.Ct. 595, 85 L.Ed. 899 are cited to sustain this position. In the last named case, Justice Douglas, speaking to the facts in that case, said that once the bill of complaint was dismissed no jurisdiction remained for any grant of relief under the cross petition. But in that case there was no jurisdictional basis for the counterclaim independent of the main action. In the Moore case, the dismissal of the main bill was not for want of jurisdiction, and the court refused to dismiss the counterclaim. Though it is suggested by Professor Shulman that it is implicit in the case that, if a plaintiff's action is dismissed for want of jurisdiction, the counterclaim falls, he adds that this is so only if there is no independent jurisdictional basis for the counterclaim. 45 Yale L. J. 393, 413. Here there is such independent basis, and the rule is that in such circumstances, when the counterclaim seeks affirmative relief, it is sustainable without regard to what happens to the original complaint. Lion Mfg. Corp. v. Chicago Flexible S. Co., 7 Cir., 106 F.2d 930, 933; Vidal v. South American Securities Co., 2 Cir., 276 F. 855, 874; Jackson v. Simmons, 7 Cir., 98 F. 768. In the Jackson case the Court of Appeals of the Seventh Circuit said: "But a cross bill which seeks affirmative relief is in the nature of an original bill wherein the cross complainant is the actor. Such a cross bill is not dependent upon the original bill, is not subject to the control of the complainant in the original bill, and does not fall with the dismissal of the original bill, whether that dismissal be the act of the complainant or the act of the

---

3 March 10, 1928, 45 Stat. 254, 50 U. S.C.A. Appendix, § 9 et seq.

4 Pflueger v. United States, 73 App.D. C. 364, 121 F.2d 732.

court." 98 F. page 773. And see also Buffalo Specialty Co. v. Vancleef, D.C., 217 F. 91.

In the instant case the cross complaint was not filed in aid of a defense asserted to the original bill, but was a suit for affirmative relief which, as we held in Cummings v. Societe Suisse, 66 App.D.C. 121, 85 F.2d 287; Societe Suisse v. Cummings, 69 App.D.C. 154, 99 F.2d 387, certiorari den'd., 306 U.S. 631, 59 S.Ct. 463, 83 L.Ed. 1033, the Attorney General and the Treasurer had the undoubted right to begin and to prosecute. That suit, like this, was brought under the Trading With the Enemy Act, 50 U.S.C.A. Appendix, § 1 et seq., to recover from the Alien Property Custodian an additional sum over and above the amount previously delivered in settlement of the claim; and there, as here, the Custodian by cross bill sought to recover back property of the trust which he asserted had been unlawfully paid. It was there insisted that the United States were powerless to recover the payment, because Congress had not in specific terms authorized such a suit. But our answer was that, when Congress gave the former owners the right to sue the Custodian, it necessarily implied power in the Custodian to defend, which included the right to assert either fraud or mistake to defeat the claim or to recover back money which had been wrongfully withdrawn from the trust. See also United States v. San Jacinto Tin Co., 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747; United States v. Minor, 114 U.S. 233, 5 S.Ct. 836, 29 L.Ed. 110; United States v. Wurts, 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932; Grand Trunk W. Railway v. United States, 252 U.S. 112, 40 S.Ct. 309, 64 L.Ed. 484; Wisconsin Central R. R. v. United States, 164 U.S. 190, 212, 17 S.Ct. 45, 41 L.Ed. 399.

In the present case, Isenberg came into the District Court to assert a claim against the United States. When he did so, he submitted himself completely to the jurisdiction of the court that justice might be done with regard to the entire subject matter. General Electric Co. v. Marvel Rare Metals Co., 287 U.S. 430, 435, 53 S.Ct. 202, 77 L.Ed. 408. We have, therefore, no manner of doubt that a suit of this nature on behalf of the United States by the Attorney General and Treasurer is authorized by law and equally no manner of doubt but that it could be filed as a counterclaim, since the plaintiff, though maintaining his residence in Germany, had submitted himself to the jurisdiction of the court.

The District Court disposed of the case by summary judgment on the counterclaim, and this, in the circumstances, was entirely proper. The record shows unmistakably and without substantial controversy that Isenberg was at the time of the seizure of his property a German national. He admits his application for and acceptance of German naturalization, and for at least half a century he continued a resident of Germany, discharging both civil and military duties as a subject and citizen of that nation. The claim that Hawaii did not permit expatriation and that the effect of naturalization in Germany created a dual citizenship was rejected by us in the case of his brother,[5] and we have no reason to modify our opinion in that respect. There can be, of course, no doubt that Germany, as one of the incidents of its sovereignty, had the right to make Isenberg a German citizen by naturalization without regard to the laws of Hawaii.[6] And so long as he continued to remain in Germany and exercise the rights conferred by naturalization, he was a German and not an Hawaiian. In this view, he could not have been a citizen of Hawaii when the Hawaiian Organic Act became effective some ten years after his naturalization and residence in Germany. It follows, therefore, that he never became a naturalized citizen of the United States on the annexation of Hawaii. As Mr. Chief Justice Fuller remarked in his dissent in the Wong Kim Ark case, "double allegiance, in the sense of double nationality, has no place in our law". Cf. Von Zedtwitz v. Sutherland, 58 App.D.C. 153, 26 F.2d 525. It follows, therefore, that the executive allowance was mistakenly made.

But even if there should be some who doubt the correctness of what we have said, there was still another reason for the granting of the summary judgment. It arises under Section 2 of the Act of March 2, 1907, 34 Stat. 1228, 8 U.S.C.A. §§ 16, 17, which creates a presumption of expatriation when any naturalized citizen shall

---

[5] Cummings v. Isenberg, 67 App.D.C. 17, 89 F.2d 489, certiorari den'd., 301 U. S. 682, 57 S.Ct. 783, 81 L.Ed. 1341.

[6] United States v. Wong Kim Ark, 169 U.S. 649, 690, 18 S.Ct. 456, 484, 42 L. Ed. 890.

have resided for five years in a foreign state and under Section 21 of the Trading With the Enemy Act, 42 Stat. 1516, 50 U.S.C.A. Appendix, § 21, which provides that this presumption shall not be held conclusive if the person shall give satisfactory evidence to the court of his uninterrupted loyalty to the United States during his absence and that he has returned to the United States or has been prevented from returning by circumstances beyond his control. We discussed these statutes fully in Cummings v. Isenberg, supra, and held them to be a bar to recovery in the case of Isenberg's brother, and no good purpose would be accomplished in repeating what was said there. It is enough that, if Isenberg was ever a citizen of the United States —which we think, beyond question, he never was—he was a naturalized citizen and subject to the provisions of the two above cited statutes, and having lived in Germany continuously since 1878 with the exception of four months in Hawaii in the latter part of 1898 and the early part of 1899, and having remained in Germany during our war with that country, and not having returned to the United States or explained his absence, it follows that the limit of his right to the return of his sequestered property is that provided for persons of German nationality.

■ The final point urged is that, even if the President was wrong in determining that Isenberg was an American citizen, the President's error is not subject here or elsewhere to challenge or correction. Counsel, to support this theory, quote from Professor Corwin's book "The President; Office and Powers", in which the author says that so far as he has been able to discover the court—presumably the Supreme Court— has never ventured to traverse a presidential finding of fact, whether it was expressed or merely implied from the order or regulation before the court. And this statement he dramatizes with a quotation from Secretary Seward to the effect that— "We elect a king for four years, and give him absolute power within certain limits, which, after all, he can interpret for himself". But with great deference to the views of Professor Corwin and Secretary Seward, we find nothing in our history which will justify a comparison of the powers of the presidential office with the royal prerogatives of a king, and we much prefer to anchor our hopes for the future safety of the Republic on that better and truer sentiment expressed by Justice Miller, that "All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it".[7] But such abstract matters to one side, the identical question on this point was decided by us in our first and second opinions in Cummings v. Societe Suisse.[8] We said: "When the corporation brought this suit, it invited the court to which it submitted itself to go behind the settlement, and at the instance of the United States, the real parties in interest, to re-examine all the questions arising out of the original claim." And a like result was reached in United States v. Rodiek, 2 Cir., 117 F.2d 588, affirmed 2 Cir., 120 F.2d 760, under facts closely parallel to the present case. To the same effect is McElrath v. United States, 102 U.S. 426, 441, 26 L.Ed. 189, followed in United States v. Burchard, 125 U.S. 176, 8 S.Ct. 832, 31 L.Ed. 662. The case of Jackson v. Irving Trust Co., 311 U.S. 494, 61 S.Ct. 326, 85 L.Ed. 297, cited by appellant, is to be distinguished, since it involved no attack on the allowance by the claimant.

Affirmed.

MEMO.—The decision in this case was reached and the opinion written prior to the declaration of a state of war between Germany and the United States.

---

[7] United States v. Lee, 106 U.S. 196, 220, 1 S.Ct. 240, 261, 27 L.Ed. 171.

[8] 66 App.D.C. 121, 85 F.2d 287; Societe Suisse v. Cummings, 69 App.D.C. 154, 99 F.2d 387, 391.