## CUMMINGS, Atty. Gen., et al. v. SOCIETE SUISSE POUR VALEURS DE METAUX.

### No. 6643.

United States Court of Appeals for the District of Columbia.

Argued May 4, 1936.

Decided June 8, 1936.

James W. Morris, Asst. Atty. Gen., and Brice Toole, John W. Scott, Enoch E. Ellison, and Harry LeRoy Jones, all of Washington, D. C., for appellants.

Frederic D. McKenney, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

GRONER, Associate Justice.

For convenience we shall call appellants (the Attorney General and Treasurer), the Custodian, and appellee (Societe Suisse), the corporation. The latter filed its bill under section 9 of the Trading with the Enemy Act[1] to recover from the Custodian further moneys in addition to moneys and properties previously paid over and transferred to it pursuant to an earlier claim filed by it under the same section of the act. In its bill the corporation alleged that it had never been an enemy of the United States within the meaning of the Trading with the Enemy Act; that the seizure of its property was unlawful; and that in the settlement with a prior Custodian the latter had wrongfully withheld certain interest which had accumulated but which had not been segregated at that time. The original payment was made September, 1921. The Custodian answered the bill and filed a counterclaim. In the answer he denied that any sum was due or payable to the corporation, and in the counterclaim sought restitution of the amount previously paid, on the ground that the original claim was fraudulent and the

---

[1] (40 Stat. 411, 419, as amended March 10, 1928, 45 Stat. 254 [50 U.S.C.A. Appendix § 9]).

moneys procured thereby unlawfully obtained.

On motion the trial court entered an order striking the counterclaim and denying the Custodian's right to cross-relief.

In the cross-bill or counterclaim, the Custodian alleged that the fund delivered in 1921 to the corporation was realized from the sale of stocks of an American corporation belonging to a German enemy; and that the seizure was in all respects lawful and in accordance with the statutes; that in 1921, one Richard Merton came to the United States as the representative of the corporation, not an alien enemy, and fraudulently claimed in its behalf title to the fund by virtue of a verbal assignment made by the former German owners of the seized shares of stock; and that he thereafter induced the Alien Property Custodian, Thomas W. Miller, by fraud and bribery to cause the claim to be allowed, as the result of which there was paid over to him for the corporation approximately seven millions of dollars; that the payment constituted a fraud upon the United States; and that the corporation now holds the same in trust as a trustee ex maleficio for the United States. The counterclaim, which it appears was filed pursuant to an order of the President (Ex.Or. 7163), contains a prayer that the allowance be declared to be void and that the corporation be ordered to repay the money to the government of the United States.

The transaction referred to was that which subsequently resulted in the indictment and conviction of Miller. See Miller v. United States (C.C.A.) 24 F. (2d) 353.

The trial court was of opinion that, as there was no express statutory authority for a counterclaim in the name of the Attorney General for the use and benefit of the United States, the motion to strike should be sustained. We granted a special appeal, and the sole question is whether the action of the court in the respect mentioned was right or wrong.

The position taken by the corporation, and approved by the lower court, is that the Custodian has no power or authority in law *in his own name* to maintain an independent action or suit to recover the sum of money claimed to have been unlawfully paid, and that the Executive Order is ineffective to supply the power; and that, being without lawful authority to maintain a suit, he is equally without lawful authority to maintain a proceeding by way of counterclaim. The basis of this is that the provisions of the act under which the property was seized and held confer no such right or power, and that, without express congressional authorization, the right does not exist. Counsel for the corporation tell us, by way of illustration, that if the President mistakenly directs payment to A of property subsequently found to belong to B, no duty is imposed upon nor power granted by the law to the Alien Property Custodian which will authorize his intervention. In such case, counsel say, to B alone is given by the statute the right by independent suit to establish his right to the property erroneously delivered under the President's order to A.

While the precise point appears, so far as we know, not to have arisen before, we have nevertheless had occasion so often to construe the statute and its provisions that reference to some of the cases in the footnote[2] may be helpful. For present purposes, it is enough to say that shortly after the entry of the United States into the World War, Congress passed the Trading with the Enemy Act under the provisions of which the United States took possession of all enemy property found in the United States and held and used it for the period of the War and for some time thereafter. The seizure transferred control of the property seized to the United States, and title, by the terms of the act, vested in the Custodian as a common law trustee. Under the war powers, Congress had the right to confiscate the property, but it never exercised that right; and, as we have had occasion to say before, never intended to. It left in abeyance the question of ultimate disposition. By section 12 of the act as amended (50 U.S.C.A.Appendix, § 12), Congress declared that "after the end of the war any claim of any enemy or of an ally of enemy to any money or other property received and held by the

---

[2] Deutsche Bank, etc., v. Cummings (decided Feb. 17, 1936) 65 App.D.C. 297, 83 F.(2d) 554; Northern Trust Co. v. Woodson, 63 App.D.C. 351, 72 F.(2d) 723; Croue v. Sutherland, 62 App.D.C. 16, 63 F.(2d) 895; Pilger v. Sutherland, 61 App. D.C. 84, 57 F.(2d) 604; Von Bruning v. Sutherland, 58 App.D.C. 258, 29 F.(2d) 631.

alien property custodian or deposited in the United States Treasury, shall be settled as Congress shall direct." And this language, the Supreme Court said,[3] suggests "that Congress reserved to itself full freedom at any time to dispose of the property as might be deemed expedient and to deal with claimants as it should deem to be in accordance with right and justice, having regard to the conditions and circumstances that might arise during and after the war."

■ Congress shortly after the war adopted a policy of piecemeal return of the property to its former owners; and subsequently, in the Settlement of War Claims Act (45 Stat. 254), provided for the return of all property held by the Alien Property Custodian. But it attached conditions; first, a claim must be filed under oath which, of course, assumes that the person filing the claim shall be legally entitled to make the claim; second, the claim must be filed within one year (later extended to three years); and, third, there must be filed written consent to the retention by this government of 20 per cent. of the property. Except upon compliance with these conditions, no right existed in any enemy alien to a return of the seized property, and in this aspect it is of no practical consequence whether the property then belonged to the United States absolutely or whether it was a fund as to which the United States occupied the position of trustee. Assuming the property was legally seized, the United States had then both the right and power to declare the property their own. And that they never did, but chose rather to regard it as a trust fund for the discharge of an honorable international obligation, does not detract one jot or tittle from either the right or power of control.

■■ In this view it seems to us wholly unwarranted to claim, as is claimed by the corporation, that the United States are bound by their former action or that the President's finding that the corporation was entitled to the return of the property so forecloses the controversy that it is not now the subject of judicial review. The government is never bound by the unlawful action of its officers; nor is it estopped by the acts of its agents in entering into an agreement or arrangement to do or cause to be done what the law does not sanction or permit. Wilber Nat. Bank v. United States, 294 U.S. 120, 123, 55 S.Ct. 362, 79 L.Ed. 798. Here we have a case, if the allegations of the cross-bill be taken as true, as for present purposes they must be, in which the corporation in conspiracy with German enemy owners of seized property, representing itself to be the true owner, by bribery and corruption induces the agent of the United States charged with the administration of the fund to deliver it over, except as to a small unsegregated portion, and then later institutes suit to recover this balance, and insists that the United States are powerless to set up the fraudulent conduct in defense of the claim or to recover the unlawful payment because Congress has not in specific terms authorized any agent in behalf of the United States to sue or to defend in those precise circumstances. We think there can be no merit in this contention.

■ Here the suit is really between the United States and the alleged fraudulent recipient of the fund, and the question is whether the latter shall be allowed to retain the unlawful fruits of a fraud committed against the United States with the connivance of their agent. The insistence that it shall, is based upon a technicality which, even if otherwise sound, no court of equity would ever recognize or enforce. No technical rule of pleading ought ever to be allowed to stand in the way of the power to do what is right under all the circumstances.[4] When the corporation brought this suit, it invited the court to which it submitted itself to go behind the settlement and, at the instance of the United States, the real parties in interest, to re-examine all the questions arising out of the original claim. And since the United States, as we have seen, are the real parties, it is of no consequence that, as a matter of convenience, they have authorized and appointed an agent to be sued in their stead. The agent is sued only in his official capacity, he has no personal and no pecuniary interest in the result, and he is suable only because the United States have consented to be sued in his name. The suit is just the same a suit against the United States. Banco Mexicano, etc., v. Deutsche Bank, 263 U.S. 591, 602, 44 S. Ct. 209, 68 L.Ed. 465; Von Bruning v. Sutherland, 58 App.D.C. 258, 29 F.(2d)

---

[3] Woodson v. Deutsche, etc., 292 U.S. 449, 54 S.Ct. 804, 805, 78 L.Ed. 1357.

[4] Frelinghuysen v. Key, 110 U.S. 63, 73, 3 S.Ct. 462, 28 L.Ed. 71.

631, 632. To say, therefore, in one breath that this is a suit against the United States and in the next that the United States are powerless to assert defenses peculiar to them because they have chosen to be sued in the name of an agent, would be to recognize the shadow and ignore the substance. The United States can act only through some human agency; and, in the seizure of enemy property and its disposition, they have set up the Custodian as and for themselves. And so the Supreme Court has held, as to this particular act, that in order to carry out its provisions, the Custodian may in his own name sue for the United States to get possession of enemy property.[5] And when recovered, it is by the act required to be held in the Treasury of the United States, and it is the United States which have the obligation of returning it if judgment for its restoration is thereafter obtained against the Custodian. Becker Steel Co. v. Cummings, 296 U.S. 74, 81, 56 S.Ct. 15, 80 L. Ed. 54.

It is going too far, therefore, to assert that, although the statute gives the Custodian complete power to seize and hold and administer the property, the mere fact that Congress has not specifically said that for its wrongful surrender, through an improvident order, he may sue for restitution in his own name, he is, therefore, without power or authority so to do. No statute is necessary to authorize the United States to sue in such a case,[6] because the right arises out of the wrong done to them; and, by like token, no particular language is necessary to authorize the Custodian to sue in his own name in behalf of the United States where, as here, Congress[7] has empowered him to "do any act or things in respect thereof or make any disposition thereof or of any part thereof, by sale or otherwise, and exercise any rights or powers which may be or become appurtenant thereto or to the ownership thereof in like manner as though he were the absolute owner thereof." When Congress gave to former owners the right to sue the Custodian, it necessarily implied power in the Custodian to defend, and it certainly did not mean so to circumscribe his rights as to leave him helpless to assert the fraud of the corporation either to defeat the claim or to recover back money which had been plundered from the trust.

Under the Settlement of War Claims Act the United States, through the Custodian, became joint trustee; trustee for the former German owners to the extent of 80 per cent. of the fund which Congress declared should be returned to them, and trustee for American claimants against Germany to the extent of 20 per cent. of the fund which Congress required to be retained and held for the purposes of the latter. And, as such trustee, the Custodian is given broad powers, broad enough, we think, to give him the right, and to make it his duty, to do all the things he sought to do in this litigation. In these circumstances, we do not hesitate to hold that the Custodian, as such, and by virtue of his office and the statutes and executive orders in relation thereto, has power and authority either in his own name or in the name of the United States to maintain a suit for the return of property illegally obtained from him; and, having this power, he likewise has power to file in his own name the answer and counterclaim he did file; and in this view the lower court clearly erred in entering the order of dismissal.

Reversed and remanded.

---

[5] Central Union Trust Co. v. Garvan, 254 U.S. 554, 41 S.Ct. 214, 65 L.Ed. 403.

[6] United States v. Bank of the Metropolis, 15 Pet. 377, 401, 10 L.Ed. 774.

[7] (as it has in section 12 of the Trading with the Enemy Act, as amended [50 U.S.C.A. Appendix, § 12]).