[No. 28552. Department One. April 30, 1942.]

BELLINGHAM SECURITIES SYNDICATE, INC., *Appellant*, v. BELLINGHAM COAL MINES, INC., *Respondent.*[1]

[1]Reported in 125 P. (2d) 668.

*Green & Burnett,* for appellant.

*Little, Leader, LeSourd & Palmer,* for respondent.

MILLARD, J.—This action was instituted to recover royalties alleged to be due as of September 30, 1940, under a contract denominated "Coal Lease," executed in 1918 by plaintiff's predecessor in interest as lessor and defendant's predecessors in interest as lessees. Under the terms of the lease, which is for a period of fifty years from August 27, 1918, the lessee was obligated to install all necessary machinery and equipment and to do all development work for extraction of the coal. The lessor was to receive twelve and one-half cents a ton for all coal mined, plus an additional royalty equal to twenty-five per cent of the net profits when the mining operations had earned a net profit to lessee equal to lessee's capital investment.

By answer, defendant alleged that payments already made exceeded the amount of royalties due to plaintiff and, as affirmative defenses, pleaded an accord and satisfaction, estoppel, waiver, and that the action was barred by the statute of limitations. The cause was tried to the court, which found that, taking into account the reasonable requirement of working capital of not less than two hundred thousand dollars for normal operations, the requirements for the expenditure of not less than one hundred and eleven thousand dollars in capital improvements, and the reasonable requirements of the defendant to safeguard against the hazards inherent in its mining operations, the defendant has not withheld as working capital any amount in excess of its reasonable requirements under its contract with plaintiff. From the foregoing findings, the court concluded that defendant was entitled to judgment of dismissal. Judgment was entered accordingly. Plaintiff appealed.

Counsel for appellant contend that the trial court erred in holding that respondent lessee, which was obligated to pay as royalty to appellant lessor twenty-five

per cent of its net profits, with the privilege of delaying payment if respondent reasonably required the money for use in its business, could successfully assert the privilege as an excuse for refusing payment of royalty from profits earned, when respondent lessee had diverted large sums from its net current assets to its stockholders in the form of dividends. Counsel for appellant also argue that the trial court erred in holding that the lease, which obligates respondent lessee to pay as royalty to appellant lessor twenty-five per cent of its net profits after the lessee's capital investment is repaid, permits the lessee in an accounting for royalty to both deduct from net profits one hundred per cent of the cost of all capital investments made and to compute net profits by deducting from gross earnings not only all operating expenses and taxes but, also, charges amortizing and depreciating its said capital investments.

The provisions of the lease pertinent to this action read as follows:

6. "Immediately upon the execution of this lease lessee will proceed with the mining of the coal deposits aforesaid by installing all necessary machinery and equipment including the buildings and necessary shipping facilities on the area to be designated on the map referred to in paragraph three hereof, all of such development work and installation to be completed within eighteen months from the date of this lease, and such mine to be thereafter during the life of this lease continuously operated to the extent that such operation may be physically and commercially practical. In addition to such installation of machinery and equipment, all of which shall be at the sole cost and expense of the lessee, the lessee shall from time to time continue to expend sufficient money in the purchase and installation of machinery, equipment, supplies and labor for the development, mining and extraction of the merchantable coal from the above described real estate."

12. "When the mining operations conducted hereunder shall have earned to lessee a net profit equal to the capital investment of lessee, the lessor shall from thenceforth during the balance of the life of this lease, be entitled to, and shall be paid by lessee, in addition to said royalty of twelve and a half cents (12½¢) per ton, the following additional royalty and consideration, to-wit: (a) the further royalty of one quarter of the net profit thereafter accruing from lessee's operations hereunder, and (b) the still further consideration of one quarter of the consideration for which lessee may (after then first obtaining the consent in writing of the lessor to do so) assign the interest of lessee in this lease. All machinery, equipment, appliances, buildings, sidings and everything used and useful, employed by the lessee in the operation of the mining business of lessee hereunder, in the event of such an assignment being made, shall be regarded as a part of this lease, and the lessor shall be paid one quarter of the entire consideration for which lessee shall with such consent, assign the interest of lessee in this lease and in said used and useful appurtenances. Should the lessee with such consent assign the interest of the lessee in this lease before the mining operations conducted hereunder shall have earned to lessee a net profit equal to the capital investment of the lessee, there shall be deducted from such consideration and retained by the lessee an amount sufficient when added to the net profit theretofore earned by lessee to equal the capital investment of lessee, and the lessor shall then be paid one quarter of the remaining consideration for which the lessee shall with such consent assign the interest of the lessee in this lease and in said used and useful appurtenances. Any involuntary alienation of lessee's interest in this lease shall be regarded as an assignment thereof entitling lessor to the same one quarter of the consideration accruing to the lessee therefor which the lessor would then have been entitled to had such alienation been a voluntary one, consented to by lessor. The lessor shall also in like manner be entitled to the same proportion of all monies paid to lessee as insurance on account of fire or other losses to any of the used and useful appurtenances aforesaid. For the

purpose only of determining 'net profit' as between lessor and lessee, the term 'capital investment' as used in this paragraph, shall mean the actual money invested by lessee, plus the cash value of all tangible property supplied or turned in by lessee in lieu of cash, employed in mining operations under this lease, but shall not, as between lessor and lessee, include any amount on account of lessee's interest in this lease, or any amount on account of lessee's interest in the additional lands and deposits contemplated by section thirteen hereof, or of lessee's investment therein of cash, tangible property, construction or operating expenses, or otherwise."

15. "Lessee shall not by any scheme or device whatsoever pay or permit to be paid any excessive salaries, wages, or unnecessary construction, equipment, or operating expenses, or devote any of the proceeds from the sale of the coal mined from the real estate described in paragraph four of this lease to any other than the economical workmanlike development of the coal mine or mines therein contained, and to the shipping and marketing of such coal, and the payment of taxes; all to the end that the highest net profits may be available for the purpose of repaying the capital investment of lessee as such term is defined in paragraph twelve hereof at the earliest time practical so that the vesting of lessor's quarter interest in the net profits thereafter to accrue be not unduly or unnecessarily delayed, all consistent with good business and good faith operation and management. . . ." .

18. "Net profit arising from lessee's operations hereunder shall not be held in reserve and undistributed beyond the reasonable requirements of lessee hereunder, and lessor's proportion of all net profit not so reasonably required shall be paid to lessor within twenty days after the expiration of each three months period in which the same shall have accrued. . . ."

Appellant concedes that respondent has made capital expenditures from August 27, 1918, to September 30, 1940, in the amount of $574,792.27. Prior to 1925, all of respondent's profits were put back into the busi-

ness. During this period of 1918 to 1940 appellant has received, as provided by the contract, twelve and one-half cents a ton for all coal mined. No "additional royalty" payments were made to appellant until July, 1925. The total earnings from the mine to September 30, 1940, aggregated $2,039,817.37. After deduction of capital investment made by respondent in the amount of $574,792.27, a balance remains of $1,465,-025.10. Of this balance, if treated as net profits, appellant would have been entitled to twenty-five per cent, or an additional royalty under the terms of the contract of $366,256.28. It is admitted that appellant received royalty payments from July, 1925, to September 30, 1940, aggregating $283,333.39. Under this computation, a balance remains of $82,922.89, which appellant claims is due to it as "additional royalty" under the contract.

In its computation, respondent first deducts from the earnings of $2,039,817.37, depreciation of $457,-794.38. From the balance of $1,582,022.99, respondent insists the capital investment of $574,792.27 should be deducted. The remainder of $1,007,230.72, respondent argues, constitutes the net profits to be divided between appellant and respondent; that appellant would be entitled to twenty-five per cent, or $251,807.68, as additional royalty; and, as appellant has already received $283,333.39, as additional royalty, appellant has been overpaid $31,525.71.

The trial court found that by July 9, 1925, respondent had invested in buildings, equipment, mine development, etc., $459,697.16; that, between July 9, 1925, and September 30, 1940, those expenditures by respondent aggregated $115,095.11. In other words, respondent's capital expenditures from inception of the lease in 1918 until September 30, 1940, were, as appellant concedes, $574,792.27. The court found that by

the end of the year 1925 respondent made profits of $599,259.36 after depreciation. That is, by the close of the year 1925, respondent had paid its debts, created a working capital, and recaptured in profits its then investment in the mine. From July 9, 1925, to and including the payment of April 10, 1940, thirty-four "additional royalty" payments aggregating $283,333.39 were made to appellant. During this same period and contemporaneous with each of the thirty-four payments to appellant, respondent paid a dividend to its stockholders of three times the amount it paid appellant.

The checks transmitted by respondent to appellant covering additional royalties do not disclose what particular periods of time are covered by the payments, and no information accompanied any remittances of inclusion, in the costs of coal sold, of any charge made by respondent on its books for depreciation. It was not until a comparatively brief time prior to commencement of this action that appellant was apprised of respondent's claim that it was entitled under the terms of the lease to deduct depreciation in computation of the proceeds distributable to appellant.

An agent of the internal revenue department, who audited appellant's books in connection with its income tax return in 1938, examined reports made to appellant by respondent, and that agent's inquiries led appellant to have an audit made of respondent's books. This, its first audit of respondent's books, was made by appellant in September, 1939, and disclosed the facts respecting deduction for depreciation, amounts paid in dividends to respondent's stockholders, and the rapidly increasing amount of current net assets being accumulated by respondent. On the basis of that disclosure, appellant made a demand for accrued royalty, which was refused; whereupon this action was com-

menced, in which appellant claimed unpaid royalty in the amount of $106,000, which claim was reduced during the trial to $104,856.39, because of income tax adjustments in 1940. Appellant now concedes that the amount due is $82,922.89.

Counsel for respondent contend that appellant has advanced a new theory based upon depreciation, under which new theory appellant abandoned its claim to recover the adjusted figure of $104,856.39. Attention is directed to a stipulation by the parties during the trial of this action, "for the purpose of determining all of the rights and liabilities of the lessor and lessee under said lease and modifications thereof, and for the purpose of determining the right of the plaintiff to recover in this action, if any, the net annual earnings (or losses) of the defendant" from the year 1919 to September 30, 1940, were stipulated as amounting to $1,582,022.99.

It was further stipulated that

"The term 'net earnings' is herein used in its general sense after deducting all expenses and charges of every kind and nature, and therefore, while it is the position of the plaintiff that it is entitled to recover the unpaid portion of twenty-five per cent (25%) of said net earnings less a capital investment of $29,264.28, nevertheless it is understood and agreed that this stipulation as to net earnings shall not constitute an admission by the defendant as to whether said net earnings are the 'net profits' of the lessee within the meaning of the lease, or any modifications thereof, and it is further agreed that each of the parties hereto reserves the right to introduce evidence at the time of the trial as to the aggregate amount of the capital investment or investments to be deducted for the purposes of determining what, if any, additional royalties are payable."

During the trial, one counsel of appellant stated,

"I just want to say as to depreciation, it was specifically understood between Mr. Little and myself that

the stipulated earnings were after deduction of depreciation, and a clause was put in there by Mr. Little which he felt would cover that point."

Counsel for respondent insist that by the stipulation the only question presented was the meaning of the phrase "net profits" as used in the lease, and that this, in turn, hinged upon the question of the capital investment of the lessee to be deducted. It is further argued by counsel for respondent that, as the question of depreciation was not raised in the complaint, it was at least inferentially removed from the case presented to the trial court for determination, if it ever was an issue; that appellant now concurs with respondent as to the meaning of "capital investment," therefore appellant has completely changed the theory of its case and is endeavoring to disregard the facts as stipulated in writing in the trial court. Summarized, respondent's argument is that, as the stipulated earnings were $1,582,022.99, appellant is precluded from now claiming recovery upon earnings which it contends aggregate $2,039,817.37—that a party may not present his case upon one theory at the trial and adopt a wholly different theory upon appeal. That is, the parties recognized at the trial that depreciation was not an issue, therefore the question of depreciation may not be urged on appeal.

The further argument is made by counsel for respondent that the practical construction of the lease from 1918 to 1940 by the parties bars any contrary construction. It is contended that for more than twenty years the parties acted in complete harmony, and that the conduct of respondent under the lease was unconditionally accepted by appellant. It is argued that appellant at all times had access to the books and records of respondent and was given monthly statements which disclosed the pertinent facts in which appellant

was primarily interested, but no questions were asked by appellant nor did it ever suggest, until immediately prior to commencement of this action, that it was not receiving all the royalties to which it was entitled under the contract. If it be assumed, argue counsel for respondent, that the terms of the lease are ambiguous, then the parties are bound by the construction adopted and appellant may not now successfully contend otherwise.

"This course of conduct over a long period of years, without protest or dissent on either side, must be held to be a practical construction of the meaning of the contract by the parties themselves, which the courts are bound to recognize and enforce." *Carlyle v. Majewski,* 174 Wash. 687, 26 P. (2d) 79.

■ We agree with counsel for appellant that appellant's theory in the trial court and on appeal are the same; that is, the gravamen of the action is the amount of royalty due, which is dependent upon the correct construction of the lease. The parties are in accord as to the wording of the lease but differ as to the legal effect of the language. Ordinarily, the construction or legal effect of a contract must be determined by the court as a question of law. 17 C. J. S. 1279.

■ ■Although the amount of recovery is concededly less than that for which appellant originally prayed, the theory of the cause of action has not in anywise been changed. The function of the allegations in paragraph ten of the complaint, with respect to respondent's capital investment and earnings, was to afford a basis for the introduction of evidence upon which computation of the sum due the appellant might be made after the legal issue was resolved and the lease construed.

In so far as the complaint alleges facts, the complaint will be regarded as amended to conform to the proof.

"9. At any time after trial, whether before or after judgment, the trial or appellate court may allow or make any amendment necessary to make a pleading conform to the proof, so far as may be just." Rem. Rev. Stat. (Sup.), § 308-6 [P. C. § 8676-9].

■ Appellant put in evidence regarding the investment of the original lessees, respondent's predecessors in interest. Respondent offered evidence as to its expenditures in development of the mine. The profits after depreciation were stipulated by the parties. The trial court found that respondent and its predecessors had put into the mine $574,792.27, which included $29,264.28 provided by two of respondent's predecessors in interest and $50,000 received from donated stock; and that after depreciation respondent had earned $1,582,022.99. The amount of depreciation deducted from gross earnings in arriving at the figure of $1,582,022.99 was $457,794.38. If this amount were added to the earnings after depreciation, the total would be $2,039,817.37. It is urged that these are the facts upon which computation of unpaid royalty must be made and the facts which, on this appeal, are to be regarded as contained in the complaint.

It should be borne in mind that the term "net profits" is the lease term the construction of which is a legal issue; and that the term "net earnings" is an accounting term which describes what remains after various deductions have been made from gross earnings. Respondent lessee may or may not be entitled, under the provisions of the lease, to make the same deductions as against appellant lessor as it does in its own internal accounting for income tax and similar purposes. Whether it may make the deductions depends upon the construction given by this court to the term "net

profits" as used in the lease. The rule precluding change of theory on appeal is not applicable. Appellant has not asserted on appeal a new cause of action upon which no evidence was taken below.

The only purpose of the stipulation was to fix the amount of net earnings after depreciation in order to avoid the expense of proving the amounts of respondent's income and disbursements. One of counsel for respondent stated, during the trial, "in other words, this represents the net earnings, so we would not have to spend days up here going over the books." Had counsel purposed the fixing of the amount "net profits," as that term is employed in the lease, they would have stipulated the answer to the legal question which is the issue in the litigation. The stipulation is specific in providing that as to net earnings the stipulation shall not constitute an admission by the appellant as to whether said net earnings are the net profits of respondent lessee within the meaning of the lease. The evidence sustains the position of appellant that the "net earnings" mentioned in the stipulation were, in fact, earnings after and not prior to depreciation.

Appellant's cause of action is bottomed on paragraph twelve of the lease, and upon the contention that respondent did not discharge the duties imposed upon it by that paragraph. The ascertainment of what those duties are necessitates determination of the ultimate meaning of that portion of the paragraph which provides that ". . . one-quarter of the net profit thereafter accruing from lessee's operations hereunder. . . ." It is clear that the word "thereafter" refers to a precedent portion of the clause which reads "when the mining operations conducted hereunder shall have earned to lessee a net profit equal to the capital investment of lessee." In other words, paragraph twelve provides that, when the mining operations conducted

under the lease contract shall have earned to respondent a net profit equal to all money invested by respondent in mine development and equipment, the appellant shall, from that time forward during the remainder of the life of the lease, be entitled to and shall be paid by respondent one-quarter of the net profit thereafter accruing from respondent's operations under the provisions of the lease.

The issue is the meaning of the phrase "net profit." Appellant contends that the phrase means "profits computed without deduction for depreciation." Respondent insists that it means "profits computed with deductions for depreciation."

 It is only in those cases where the writing fails to provide the answer to a question of meaning that the courts may look elsewhere for aid in construction. Where the terms are plain and unambiguous, the meaning of the contract is to be deduced from its language. 17 C. J. S. 695. That the position of appellant is correct and it is unnecessary to resort to aids to construction, is clear from an examination of the whole contract, which must be construed as a whole, and the intention of the parties gathered from the entire instrument. There is no room for the application of the rule of practical construction. The agreement is not ambiguous. The parties did not have one meaning in mind when the instrument was executed, and they subsequently acted in a manner consistent with one meaning and inconsistent with another. There is no evidence that the appellant acted in the past in any way inconsistent with its present position.

 Counsel for respondent next argue that there has been an accord and satisfaction which bars recovery in any event; that all payments of additional royalties were uncertain, as the profits earned by respondent

and the amounts to be held in reserve both for capital investment and working capital varied from period to period, therefore the payments of additional royalties constituted payments upon an unliquidated account; and that, as the payments were tendered for additional royalties due up until the date of each payment and were accepted unconditionally and without protest by the lessor, there has been an accord and satisfaction. *Paulsen Estate, Inc. v. Naches-Selah Irrigation Dist.,* 190 Wash. 205, 67 P. (2d) 856.

Respondent's affirmative defense of accord and satisfaction imposed upon it the burden of proving such defense. The evidence does not establish the existence of a contract between respondent and appellant under the terms of which the latter agreed that the former should be fully discharged of its duty to pay additional royalty. The evidence does not sustain a position that remittances made by respondent, either prior or subsequent to appellant's audit of respondent's books, were intended by respondent to be in full payment of all accrued royalty.

To create an accord and satisfaction in law, there must be a meeting of minds of the parties upon the subject, and intention on the part of both to make such an agreement. *Ingram v. Sauset,* 121 Wash. 444, 209 Pac. 699, 34 A. L. R. 1031; *Graham v. New York Life Ins. Co.,* 182 Wash. 612, 47 P. (2d) 1029.

Respondent has also failed to sustain the burden of proving consideration. It must be remembered that an accord and satisfaction is founded on contract, and consideration therefor is as necessary as for any other contract. The duty imposed by the lease upon respondent to pay additional royalty to appellant was a liquidated obligation. None of the payments made by respondent prior to 1939, when a dispute arose over

the amount due, could be consideration for an accord and satisfaction. After the dispute arose, respondent's payments could not furnish consideration. Where a debtor pays what in law he is bound to pay and what he admits that he owes, such payment by the debtor and its acceptance by the creditor, even if tendered as payment in full of a larger indebtedness, can not operate as an accord and satisfaction of the entire indebtedness, as there is an absence of consideration therefor. *Seattle Investors Syndicate v. West Dependable Stores,* 177 Wash. 125, 30 P. (2d) 956; *Graham v. New York Life Ins. Co.,* 182 Wash. 612, 47 P. (2d) 1029.

The affirmative defense of estoppel was also pleaded by respondent, whose counsel insist that, having either actual or constructive knowledge of the facts, appellant induced respondent by its conduct to believe that appellant acquiesced in or ratified the monthly transactions between the parties; that, having induced respondent, who had a right to rely upon such conduct, appellant may not now alter its position but is estopped from repudiating the transaction to the prejudice of the respondent. In support of this position, counsel cite *Reynolds v. Travelers Ins. Co.,* 176 Wash. 36, 28 P. (2d) 310, where we said:

"An estoppel is a preclusion by act or conduct from asserting a right which might otherwise have existed, to the detriment and prejudice of another who, in reliance on such act or conduct, has acted upon it."

The defense of estoppel is without substantial merit. The facts upon which respondent apparently relies to support this affirmative defense are: (1) Respondent sent statement of profits monthly to appellant; (2) respondent made periodic payments of royalty; (3) appellant failed to audit respondent's books until 1939; (4) appellant failed for a number of years to claim the

additional royalty to which it was or now claims to be entitled; (5) respondent expended large sums of money in development of the mine.

The statements sent by respondent to appellant did not disclose deductions for depreciation, nor did the payments periodically made to appellant disclose the particular periods of time they covered. Appellant did not audit respondent's books until 1939, but this failure to audit was because of appellant's confidence in respondent and there was nothing charging appellant with notice that it was not receiving the royalty to which it now claims to be entitled. Until some reason for suspicion arose, appellant can hardly be deemed negligent because of its failure to audit respondent's books. Appellant creditor, like any other creditor who received reports and remittances as in the case at bar, is not chargeable at its peril with knowledge of errors simply because an audit of the debtor's books might have revealed such errors. Estoppel by silence does not arise without full knowledge of the facts, and a duty to speak on the part of the person against whom it is claimed. *Consolidated Freight Lines, Inc. v. Groenen,* 10 Wn. (2d) 672, 117 P. (2d) 966.

Respondent may not successfully urge, in support of its affirmative defense of estoppel, that it was misled by appellant's receipt of reports and royalty payments without objection. It should be borne in mind that respondent knew, as well as appellant, what the terms of the lease were; hence, where parties have equal means of knowledge there can be no estoppel in favor of either. *Wilkinson v. Leberman,* 327 Mo. 420, 37 S. W. (2d) 533.

Respondent has not changed its position in reliance upon any of the alleged representations of appellant. Respondent did not make any expenditures

in developing and equipping the mine which it was not obligated to make under the terms of the lease. The only detriment which the respondent will suffer by having to pay the royalty due is that entailed in performance of its obligation under the lease to pay royalty. The mere failure to pay what one owes is not a change of position which will support an estoppel.

Another affirmative defense urged by respondent is that of waiver. It is argued that, impliedly at least, appellant voluntarily relinquished a known right and that, as we held in *Reynolds v. Travelers Ins. Co., supra,* an implied waiver arises where one party has pursued such a course of conduct as to evidence an intention to waive a right, or where the conduct of such party is inconsistent with any other intention than to waive it.

The defense of waiver is likewise without substantial merit. The only kind of waiver which may be urged by respondent is one which is coextensive with the doctrine of estoppel and what we have said above with regard to estoppel adequately answers respondent's argument as to the affirmative defense of waiver.

Counsel for respondent pleaded in bar of the action, and now urges on appeal, the statute of limitations. It is insisted that the right of appellant to sue for the additional royalties accrued when it became a present, enforcible demand; that, as respondent was required by paragraph eighteen of the lease to pay appellant its proportion of the additional royalties within twenty days after the expiration of each three months' period in which the same accumulated, appellant is precluded from receiving those royalties to which it would be entitled which accrued more than six years prior to the commencement of this action.

Respondent's argument that appellant's right to recover unpaid royalty is barred by the statute of

limitations is met by the rule that the statute begins to run when the obligee has a legally enforcible right; that is, when all conditions precedent to a duty of immediate performance by the obligor have been satisfied.

The provision of paragraph eighteen of the lease, that royalty otherwise due and payable may be withheld if respondent lessee's reasonable requirements dictate, operates to create a condition precedent. The statute of limitations is an affirmative defense, which imposes the burden upon the one asserting it of proving every element necessary to establish it. 34 Am. Jur. 352. The burden was imposed upon respondent of proving that, as to all of the accrued royalty sought in this action, the condition was satisfied more than six years prior to the commencement of the action. We find no evidence by the respondent upon this subject. That is, respondent has not established a maturity date prior to 1934 for the debt here in suit, therefore it failed to sustain the burden of proof.

It is an erroneous assumption that respondent's obligation to pay matures twenty days after the expiration of the quarter in which profits are earned; such assumption ignores the fact that the same paragraph of the lease providing for such payment also contains the condition mentioned above.

"It is a general rule that, where payment is provided for out of a particular fund or in a particular way, the debtor cannot plead the statute of limitations without showing that the particular fund has been provided or the method pursued, if the existence of that fund creates the cause of action." 37 C. J. 813, § 158.

"Whether the contingency affects the right or merely the amount of recovery, the rule is the same; if plaintiff is entitled to recover a greater or less amount, dependent upon a certain contingency which may or may not happen, the statute runs against him only after the

amount to which he is entitled becomes certain." 37 C. J. 812, § 154.

▮ There is another answer to the affirmative defense of the statute of limitations: Respondent's remittances on account of additional royalty did not indicate they were intended by the respondent as payment of royalties accruing during any particular period of time. Since respondent did not direct the application of the same made by it and since the appellant credited them generally, the application of those payments, as a matter of law, would be applied to the oldest items of the account. The rule is that, when neither the debtor nor the creditor seasonably exercises his power to apply payment to one of several debts, the payment is applied to the earliest matured debt to which the creditor might have applied it. See Restatement of Law of Contracts, 743, § 394, and *Whiting v. Rubinstein,* 10 Wn. (2d) 5, 116 P. (2d) 305.

▮ Counsel for appellant correctly argue that, if the express covenant to pay as royalty one-quarter of the net profits thereafter accruing from lessee's operation under the terms of the lease were unqualified, respondent would be obligated to pay, immediately upon accrual of profits, twenty-five per cent of those profits to appellant lessor. The first qualification is in paragraph twelve of the lease, which provides that, when the mining operations conducted under the lease shall have earned to lessee a net profit equal to the capital investment of the lessee, the lessor shall from thenceforth, during the remainder of life of the lease, be paid the additional royalty of twenty-five per cent of the net profits thereafter accruing. ·

In paragraph eighteen of the lease is a second qualification of the language, quoted in the early part of this opinion, reading as follows:

"Net profit arising from lessee's operations hereunder shall not be held in reserve and undistributed beyond the reasonable requirements of lessee hereunder and lessor's proportion of all net profit not so reasonably required shall be paid to lessor within twenty days after the expiration of each three months' period in which the same shall have accrued."

That is, after recouping its capital investment, respondent is obligated to pay from the net profits accruing from respondent's operation of the mine an additional royalty of twenty-five per cent of the net profits, which respondent lessee may pay quarterly to appellant lessor. Respondent lessee is given the privilege of further delaying payment if its reasonable requirements necessitate retention of the royalty due to appellant lessor. The language is plain. Clearly, the nonexistence of *reasonable requirements* is a condition precedent to respondent lessee's duty to pay as royalty twenty-five per cent of accrued net profits to appellant lessor. Any justification for nonpayment which respondent may have must be found in the provision of paragraph eighteen quoted above.

Respondent's position is untenable in that it seeks double credit for capital expenditures. Respondent claims that it is entitled to credit for full cost of equipment, etc., under paragraphs six and twelve of the lease as a capital investment, and that it is entitled to credit for depreciation reserve because the mine must be kept up and equipment is to be bought from those reserves.

We reiterate that a reading of the contract discloses the intention of the parties, which was that lessee would purchase the necessary machinery and equipment for operation of the mine and that, until sufficient net profits accrued to pay for such machinery and equipment, appellant lessor would not be entitled to additional royalty payments; that the duty of replac-

ing equipment was solely the duty of respondent lessee—otherwise, the lessor would be compelled, in effect, to buy the equipment; and that, until equipment was bought and cost of same paid from net profits, paragraph eighteen of the lease was not operative. A contrary holding would be in opposition to the provision of paragraph six of the lease, which provides for the installation by lessee of all necessary machinery and equipment.

Counsel for appellant contend that the trial court's finding that two hundred thousand dollars was needed by respondent for working capital, exclusive of reserve for contingencies, and that one hundred and eleven thousand dollars additional would be required for future purchase of equipment within the meaning of *reasonable requirements,* as the phrase is employed in paragraph eighteen of the lease, is erroneous.

On September 30, 1940, respondent's net current assets were $316,017.84. It is significant that respondent's witnesses testified that the working capital and equipment replacement expenditures aggregating three hundred and eleven thousand dollars, approximated the total of respondent's current net assets. Evidently, the trial court was convinced that the matter of requirements was within the discretion of respondent's officers and that their testimony of the amount needed foreclosed any question of the amount needed.

The phrase "reasonable requirements" in paragraph eighteen of the lease may not be construed to include reserves for the future acquisition of equipment, and the evidence will not support a finding that respondent has, in fact, treated the acquisition of equipment as the subject of a reserve fund. It is improbable that any sum as great as that which respondent's witnesses testified was required, is needed all at once. Since

1918, respondent has expended three hundred and fifty thousand dollars for equipment. The testimony of respondent's witnesses that the mine is in first class condition, if true, is not consistent with the testimony on behalf of respondent of the need, at once, of one hundred and eleven thousand dollars to purchase equipment. Let us assume, however, that all of the equipment was needed immediately, it would not be reasonable to include all of it as a "reasonable requirement." It is a matter of common knowledge that, if orders for equipment were placed at once, some months would elapse prior to delivery and installation of the equipment. Also, payment would not be due until installation and acceptance of the equipment. Respondent is earning profits and it could well accumulate the necessary funds between now and the date payment is due, or it could make payment directly out of the then current earnings, which under the evidence would be sufficient.

Respondent may not successfully invoke the provision of paragraph eighteen of the lease to sustain its position that the replacement of equipment is a "reasonable requirement," as the language of the lease nowhere expressly or impliedly makes provision for funds to be expended in the future for equipment. Appellant lessor and respondent lessee intended the term "working capital" to mean resources to be used in operation of the mine. When the lease was executed, respondent lacked working capital. The parties knew that working capital would have to be created from sale of coal and that royalty payments to appellant, which would impair working capital, would, of course, interfere with the economical and profitable operation of the mine. That significance does not attach to the future acquisition of equipment. Reading the lease as a whole, the only reasonable conclusion

is that the duty of replacing equipment rests solely on respondent lessee. If that were not so, appellant would, in effect, be forced to buy the equipment. Once equipment has been actually purchased, if respondent's then current asset position is such that paragraph eighteen of the lease is operative, royalty payments can be properly deferred; that is, until equipment is bought paragraph eighteen is not effective.

"Reasonable requirements" under paragraph eighteen of the lease does not include assets to be later used to replace equipment. On September 30, 1940, at which time appellant sought payment of royalty, respondent had a surplus in excess of four hundred thousand dollars and net current assets of approximately three hundred and sixteen thousand dollars. Under the provisions of paragraph eighteen of the lease, respondent may defer payment of additional royalty if payment would leave respondent without resources ample for its "reasonable requirements." If appellant were paid the full amount it claims on this appeal, respondent would still have in excess of two hundred and thirty thousand dollars of net current assets and a surplus of more than three hundred and twenty thousand dollars. It is plain to see that respondent would not be left without resources sufficient for its "reasonable requirements," even if two hundred thousand dollars were allowed for working capital, as thirty-four thousand dollars would then remain for the future purchase of equipment which would be ample, although we hold that respondent may not claim as "reasonable requirement" any part of the cost of future equipment.

Even if the finding of the trial court respecting the amount of three hundred and eleven thousand dollars needed by respondent as working capital and for the purchase of equipment were correct, which

sum is approximately equal to respondent's present net current assets, appellant's claim for royalty may not be defeated by such a defense. The alleged insufficiency of respondent's net current assets to both pay royalty and cover reasonable requirements is the result of respondent's wrongful depletion of its current assets through the payment of dividends to its stockholders. If respondent reasonably requires a sum equal to its net current assets those assets are deficient because of respondent's own wrongdoing, but for which it would today have ample funds to pay appellant and to meet respondent's requirements. As respondent has made impossible the performance of a condition precedent upon which its liability, by the terms of the lease agreement, is made to depend, respondent can not avail itself of its own nonperformance; in other words, respondent may not invoke such condition to defeat its liability. 17 C. J. S. 969; 12 Am. Jur. 885; 6 R. C. L. 945; *Payne v. Ryan,* 183 Wash. 590, 49 P. (2d) 53; *Field v. Northwestern Fruit Exchange,* 180 Wash. 580, 40 P. (2d) 985.

The lease establishes the legal relationship of respondent and appellant. By the terms of that lease, appellant is simply a landlord and respondent is a tenant. Appellant is not a stockholder in respondent corporation, and the royalties are not in any sense dividends. Appellant is, as to accrued royalty, a creditor of respondent and the latter, like any other corporation, owes its primary responsibility to its creditors. The payment by respondent of dividends to its stockholders to the detriment of its lease obligation can not be justified and respondent will not be permitted to assert the provision of paragraph eighteen of the lease respecting reasonable requirements against appellant's claim for royalty.

Respondent's position that it is entitled to credit

for depreciation reserve because the mine must be kept up and equipment must be bought from those reserves, is not tenable, in that respondent endeavors to obtain double credit for capital expenditures, which is contrary to the intention of the parties, as appears plainly from the language of the lease. When new equipment is bought, respondent intends to claim credit for its full cost as a *capital investment*. Respondent makes no contention that any of the replacement equipment it has already bought has not been included in the credit of $574,792.27 it claims for capital investment, which amount includes all of the plant and equipment respondent has bought both originally and by way of replacement.

Counsel for appellant suggest an apt illustration of the position of respondent in deducting its capital expenditures from profits before appellant's twenty-five per cent is computed: If respondent earns one hundred thousand dollars in a given year and expends during that year twenty thousand dollars on equipment, appellant would get twenty-five per cent of eighty thousand dollars or twenty thousand dollars. If respondent were not entitled to deduct the twenty thousand dollars, appellant would receive twenty-five thousand dollars. In other words, appellant would contribute five thousand dollars to the acquisition of the equipment. The above quoted portion of paragraph twelve of the lease recognizes this fact and provides that, if respondent lessee sells the equipment or collects insurance upon destruction of the equipment, appellant lessor would receive twenty-five per cent of the proceeds. If "net profits" were interpreted as respondent contends, this portion of paragraph twelve would not be understandable. Appellant would be required to contribute two twenty-five per cents: One

when the property was bought, the other when depreciation was charged against profits and appellant would receive only one twenty-five per cent from the proceeds of sale or insurance.

We are clear that "net profits," as that term is used in paragraph twelve of the lease, does not mean profits after depreciation. To hold otherwise respondent would receive double credit for capital expenditures, which is in conflict with the terms of the lease. Appellant is entitled to recovery in the amount of $82,922.89, with interest at the legal rate thereon from September 30, 1940, together with costs.

Judgment is reversed, and the cause remanded with direction to the trial court to enter judgment in favor of appellant in the amount of $82,922.89, with interest at the legal rate thereon from September 30, 1940, together with costs.

ROBINSON, C. J., MAIN, STEINERT, and DRIVER, JJ., concur.