Henry A. CAREY, Jr., Edwin D. Hicks, J. Pierre Kolisch and Joseph Schulein

v.

**UNITED STATES.**

No. 112–58.

United States Court of Claims.
April 6, 1960.

386

Paul D. Hanlon, Portland, Or., for plaintiffs. Gerhard P. Van Arkel and Van Arkel & Kaiser, Washington, D. C., were on the briefs.

Asst. Atty. Gen. George Cochran Doub for defendant. M. Morton Weinstein, Washington, D. C., was on the briefs.

MADDEN, Judge.

The plaintiffs sue for royalties which, they claim, are owing to them pursuant to a contract. The Government says that it has no contract with the plaintiffs; that the contract on which the plaintiffs base their claim is a contract with the Attorney General of the United States, acting in his capacity as Alien Property Custodian, and that in that capacity he is a legal entity separate and different from the United States. The Government also asserts other defenses.

A Dr. William Kroll, a citizen and resident of Luxembourg, was an inventor. In 1934 he made a contract with a German corporation, Siemens & Halske, hereinafter called S&H, under which he gave to S&H an exclusive license to use his then present and future patents, and the power to sublicense others to use them, Kroll to receive royalties in accordance with a provision in the contract.

In 1936 Kroll invented a process for the production of the metal titanium, and in 1940 he received United States Patent No. 2,205,854 covering this invention. The contract which Kroll had made with S&H in 1934 applied to this invention, hence S&H had an exclusive license to use it, and the power to sublicense others to use it, both subject to the royalties reserved to Kroll in the 1934 contract.

In 1943 the United States Alien Property Custodian "vested", i. e., took title to, Kroll's titanium patent as the property of Kroll, the Custodian assuming that Kroll was a national of Luxembourg, a country which had been occupied by the Germans. Unknown to the Custodian, Kroll had left Luxembourg and come to the United States in February, 1940. In 1947 Kroll instituted a suit in the United States District Court for the District of Columbia, under section 9(a) of the Trading With the Enemy Act, as amended, 50 U.S.C.A.Appendix § 9(a), seeking the return of his property on the ground that he was not an alien enemy. The Custodian by that time had learned of Kroll's contract with the German firm S&H. The Custodian was willing to return Kroll's patent to him, subject to the rights of S&H in the patent, which rights the Custodian insisted upon retaining. Kroll took the position that S&

H had no rights in the patent, and hence the Custodian had no rights.

The judgment in the District Court, rendered in 1951, affirmed, Kroll v. Mc-Grath, 91 U.S.App.D.C. 172, 199 F.2d 187, was that the Custodian should return the ownership of the patent to Kroll, but that the Custodian, as the successor to the alien enemy firm S&H had the exclusive license and the power to sublicense which Kroll had granted to S&H. The judgment provided that the royalty rates at which the Custodian might grant sublicenses should be agreed to by Kroll and the Custodian, but that if the parties could not agree within 30 days the court would, upon application, set the royalty rates.

The parties were not able to agree and, upon application, the court set the rates to be computed on annual production, retroactive to April 3, 1951, at five percent of the gross sales price on the first 50,000 pounds of titanium, three percent on the next 50,000 and one percent on amounts in excess of 100,000 pounds, those rates being separately applicable to each sublicensee. The order provided that Kroll's one-half of the royalties from sublicensees, pursuant to his contract with S&H, should be paid directly to him.

The Attorney General, who had succeeded to the functions of the Alien Property Custodian, conveyed the legal title to the patent to Kroll. Kroll sold the patent to a corporation which in turn sold the patent to the instant plaintiffs.

The United States, acting through its Bureau of Mines, produced titanium, without any license from the Attorney General, and without paying any royalties to anyone. In addition, and of principal importance in this litigation, the Attorney General licensed several manufacturers to produce titanium for the United States, using the Kroll patented process. The titanium so produced was purchased from the manufacturers by the United States, acting through its General Services Administration, and was stockpiled by the United States.

We have said that the contract between Kroll and S&H covered numerous patents which had been issued to Kroll. The contract gave S&H an exclusive license to use all these patents. It said, "The amount of royalties to be paid by S&H to Kroll is to be computed depending upon the importance of the invention * * *." The contract further provided that if the parties could not agree on the amount of the royalties, each party should appoint an arbitrator, and if the arbitrators could not agree, "then the decision must be rendered exclusively by recourse to the regular courts of law. The City of Berlin is agreed upon as exclusive place of jurisdiction."

The contract also, as we have seen, provided that S&H had the power, with the consent of Kroll, to grant sublicenses. The royalties from sublicenses were to be shared equally by Kroll and S&H.

As we have seen, the Attorney General, as successor to the rights of S&H, licensed several manufacturers to use the Kroll process, at the royalties fixed by the order of the District Court. The manufacturers paid one-half the royalties to Kroll and one-half to the Attorney General. The plaintiff says that it was the United States which owned the S&H exclusive license; that the United States caused the titanium to be manufactured for itself, pursuant to its exclusive license; and that the United States was, therefore, indebted to Kroll, or his successors, for the entire royalty, and not only for the one-half of the royalty which the manufacturers paid to Kroll.

The Government says that it did not own the exclusive license; that it was owned by a separate juristic entity, the Attorney General; and that when he licensed the manufacturers to manufacture titanium for the United States, and not for himself, he was granting a sublicense rather than exercising his exclusive license which he owned pursuant to the S&H contract, to the ownership of which he had succeeded. If the arrangements were sublicenses, as the Government contends, Kroll and his successors were entitled to only one-half the royal-

ties, and they have already received that much.

We do not agree with the Government's contention that the Attorney General, in his capacity as Custodian of Alien Property, is a distinct juristic entity, and not an agent of the United States. The Government quotes section 12 of the Trading With the Enemy Act, 50 U.S.C.A.Appendix, § 12, which says that "The alien property custodian shall be vested with all of the powers of a common-law trustee in respect of all property" vested in him, and may exercise powers appurtenant to the property "in like manner as though he were the absolute owner thereof * * *." We see nothing more in this language than the creation of an agency with powers much greater than the usual powers of an agent. The ordinary agent, for the Government or for a private principal, cannot convey the title to his principal's property, unless he holds a power of attorney authorizing him to do so. A common law trustee may, if he is acting within the scope of the trust, convey the title of property the beneficial ownership of which is in another person. Congress has, by section 12, conferred upon the Custodian a broad and general power of attorney, by defining his powers in terms of those of a common law trustee.

The Trading With the Enemy Act must be examined more closely to see whether it, as the Government urges, created a legal entity separate from the United States. On the side of affirmative action, the power to take title to property, to bring legal actions to reduce property to possession, to collect money, to convey property, to enter into contracts, the Custodian's authority is ample. What of the negative side? What authority does he have to respond to claims? In the instant case, for example, the Custodian vested, took title to a contract made between an alien enemy, S&H, and Kroll, not an alien enemy, and whose patent was not subject to vesting and was not vested. The contract, which was vested, conferred rights upon S&H, and also created obligations. The Custo-dian succeeded to the rights, and also to the obligations. If he did not succeed to the obligations, then his vesting of the contract accomplished the forfeiture of valuable rights of Kroll whose property and rights were not subject to seizure.

The instant suit is a suit by Kroll's successors to enforce what they claim to be contract rights under their contract with the Custodian. If Kroll's rights under the contract were not forfeited, and there was no possible reason for forfeiting them and the Government does not claim that they were forfeited, where may they be enforced? The Government points to section 9(a) of the Trading With the Enemy Act, 50 U.S.C.A.Appendix, § 9(a), which says, in pertinent part:

"Any person not an enemy or ally of enemy claiming any interest, right or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States * * * may institute a suit in equity in the United States District Court for the District of Columbia or in the district court of the United States for the district in which such claimant resides, * * * to establish the interest, right, title or debt so claimed, and if so established the court shall order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian * * *"

This is the only statutory provision for suits against the Custodian. Its purpose is to enable one whose property has been vested on the ground that he was an enemy alien to prove in court that he was not an enemy alien, and to obtain specific restoration to him of the property seized from him. The statute has nothing to do with breaches of contracts made by the Custodian or to the obligations to which the Custodian has succeeded by reason of vesting the interest

of a contracting party. The plaintiffs here are not seeking the restoration of property seized from them. They have their patent and they have their contract for royalties. The Custodian has his license, and the obligation to pay royalties in accordance with the contract. The plaintiffs claim that he has breached that obligation.

In the case of Von Bruning v. Sutherland, 58 App.D.C. 258, 29 F.2d 631, the Court of Appeals for the District of Columbia dealt with the problem of the scope of section 9(a). The Custodian had vested a house and lot, had used it for Governmental purposes and damaged it to the extent of $6,000, and had, after 28 months restored it to the owner, presumably because he had concluded that the owner was not an enemy alien. The owner brought suit under section 9(a) for the $6,000 damages, and for the value of the use and occupation of the property for 28 months. Recovery was denied, the court holding that the sole remedy afforded by section 9(a) was the return of the seized property; that the suit was in reality a suit against the United States, and that the United States had not consented to be sued for damage to property or for its use and occupation. See also Pflueger v. United States, 73 App.D.C. 364, 121 F.2d 732.

█ The Trading With the Enemy Act grants no authority to the Attorney General as Alien Property Custodian or otherwise to take money out of the United States Treasury in general, or out of the special fund in the Treasury in which the money proceeds of vesting are deposited, to pay judgments for breaches of contract. Nor does it contemplate, we suppose, that the Attorney General should personally pay such a judgment, even if he were personally able to do so. If then, the victim of a breach of contract by the Custodian has any relief anywhere; if a contract vested by the Custodian is not to be converted into a one-sided contract, giving its benefits to the Custodian but forfeiting its obligations to the other party to the contract, that relief must be had in a suit against the United States under the Tucker Act, 28 U.S.C. §§ 1346 and 1491.

In Cummings v. Deutsche Bank Und Discontogesellschaft, 300 U.S. 115, 57 S. Ct. 359, 81 L.Ed. 545, which was a suit in equity against the Attorney General as successor to the Alien Property Custodian for return of property seized under the Trading With the Enemy Act, the Supreme Court said:

"This is in substance a suit against the United States." [300 at page 118, 57 S.Ct. at page 361]

Concerning title to property vested under the Trading With the Enemy Act, the Court said:

"The title acquired by the United States was absolute and unaffected by definition of duties or limitations upon the power of the Custodian or the Treasurer of the United States." [300 U.S. at page 120, 57 S.Ct. at page 362]

In Cummings v. Société Suisse Pour Valeurs De Métaux, 66 App.D.C. 121, 85 F. 2d 287, the court said:

"Assuming the property was legally seized, the United States had then both the right and power to declare the property their own. And that they never did, but chose rather to regard it as a trust fund for the discharge of an honorable international obligation, does not detract one jot or tittle from either the right or power of control. [85 F.2d at page 289]

\* \* \* \* \*

" \* \* \* And since the United States, as we have seen, are the real parties, it is of no consequence that, as a matter of convenience, they have authorized and appointed an agent to be sued in their stead. The agent is sued only in his official capacity, he has no personal and no pecuniary interest in the result, and he is suable only because the United States have consented to be sued in his name. The suit is just the same a suit against the United States. [85 F.2d at page 289]

\* \* \* The United States can act only through some human agency; and, in the seizure of enemy property and its disposition, they have set up the Custodian as and for themselves \* \* \*." [85 F.2d at page 290]

See also Banco Mexicano de Commercio e Industria v. Deutsche Bank, 263 U.S. 591, 603, 44 S.Ct. 209, 68 L.Ed. 465.

Our conclusion is that the S&H contract, with not only the rights but also the liabilities of S&H, passed to the United States, and that the United States is the proper party defendant in this suit for the alleged breach of the contract.

The Government urges, as we have said, that the transactions in question were sublicenses; that, therefore, Kroll was entitled to only one-half the royalties, and that he received that one-half. Here we again encounter the problem of whether the Custodian was or was not an agent of the United States vesting title in the United States. We have concluded above that the United States owned the license. If, when it caused the several manufacturers to use the Kroll patent in producing titanium it was exercising its own license, and was not sublicensing the manufacturers to use the patented process for their purposes, it would follow that Kroll, or his successors, would be entitled to the royalty provided in the contract for the case of exercise of the license by the United States, as successor to S&H, and not merely the half royalty provided in the contract for cases of sublicensing.

The Government urges, in the alternative, defenses of an equitable nature. It points out that Kroll's process, when the United States first concerned itself with it, was only a laboratory process, producing quantities of titanium so small that they were commercially useless; that the United States Bureau of Mines developed the process so that large and useful quantities could be produced; that except for the activities of the Bureau of Mines the owners of the patent would not have profited from the patent; and that as a result of those activities the owners have received large sums by way of royalties.

It is not an uncommon event that an inventor has neither the facilities nor the finances to exploit his patent commercially, and that some enterprise which has facilities and finances does exploit it, pursuant to a license from the inventor. The fact that the inventor, but for the activities of the exploiter, would have had little or no return from his patent is no reason why he should not be paid the agreed royalties, even though they turn out to be very large.

The Government urges that the plaintiffs should be estopped from asserting the instant claim because they were aware of and even took part in the negotiation of the license and royalty agreements between the Alien Property Custodian and the manufacturers. The plaintiffs answer that those agreements contemplated the sale of some of the production of titanium to private industry, to which production the sublicense provision of the S&H contract would have been applicable. It appears that the reason that all of the production went to the Government was that the price which the General Services Administration guaranteed to the manufacturers turned out to be higher than the market price, hence the production went into the Government's stockpile.

The plaintiffs sought information from the Custodian as to the sales by the manufacturers, i. e., whether they were made to private industry or to the Government. The Custodian replied that it would be inappropriate to attempt to obtain that information, either from the manufacturers or from the General Services Administration. We do not find in the record in this case the basis for an estoppel of the plaintiffs to assert the rights which their contracts gave them. We further think that if there had been a temporary acquiescence in an arrangement under which they received less than their rights, that would not have given rise to an estoppel. The Government has not shown that its conduct was engaged in reliance upon any such supposed ac-

quiescence or was affected by it. One does not forfeit his right under a contract by misinterpreting it, or by acquiescence in a misinterpretation of it by the other party to it, unless he thereby misleads the other party, to his detriment. See Bellingham Securities Syndicate v. Bellingham Coal Mines, 13 Wash. 2d 370, 125 P.2d 668, 677–678.

The contract between Kroll and S&H provided, as we have seen, that if S&H made use of its exclusive license it should pay Kroll a royalty "to be computed depending on the importance of the invention." The provision that in case of disagreement there should first be arbitration by two arbitrators, one named by each party, and that if they could not agree, the question should be litigated in the courts of Berlin, would seem to be impractical of application.

The contract between Kroll and S&H, as we have seen, left the amount of the royalties to be paid by S&H to Kroll, in case S&H itself used the patented process, for future determination. That determination was to be arrived at by procedures which are no longer available. We must, therefore, determine what, in the circumstances here present, would be a proper royalty, "depending upon the importance of the invention."

We remand the case to a commissioner of this court for the purpose of taking evidence and reporting to us upon the question stated in the preceding paragraph, and upon the facts and circumstances in relation to the Government's contracts with the several manufacturers which will enable us to conclude whether the Government was, in its transactions with those manufacturers, exercising its rights as exclusive licensee, or was granting to them sublicenses, pursuant to the contract between Kroll and S&H.

The commissioner will also report upon the amount of production of the United States, and the several manufacturers, under their contracts with the United States.

The plaintiff's and defendant's motions for summary judgment are denied.

It is so ordered.

JONES, Chief Judge, LARAMORE and WHITAKER, Judges, and LITTLETON, Judge (ret.), concur.