Henry A. CAREY, Jr., Edwin D. Hicks, J. Pierre Kolisch and Joseph Schulein

v.

The UNITED STATES.

No. 112–58.

United States Court of Claims.
Jan. 24, 1964.
Rehearing Denied April 17, 1964.

Paul D. Hanlon, Portland, Or., for plaintiffs, Gerhard P. Van Arkel, and Van Arkel & Kaiser, Washington, D. C., on the briefs.

M. Morton Weinstein, Dept. of Justice, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

WHITAKER, Judge.

Plaintiffs, claiming to be the owners of a patented process for manufacturing titanium, sue to recover royalties on the use of that process. They claim that defendant, by virtue of its seizure of the assets of Siemens & Halske, a German corporation, under the authority of the Trading with the Enemy Act, succeeded to the contractual obligations of that corporation, which had agreed to pay the inventor a royalty in return for an exclusive license to use the patent and to permit others to do so. Plaintiffs say that, from August 1, 1951 to June 25, 1957, defendant, by its own agencies and through contracts with private business concerns, caused the production of a large quantity of titanium by the patented process, and that this was done through the exercise of the exclusive license. Hence, they say, defendant is obligated to pay royalties in accordance with the terms of the exclusive license.

This case is before us for the second time. In Carey, et al. v. United States, 276 F.2d 385, 149 Ct.Cl. 587 (1960), we held that plaintiffs were entitled to maintain this action against defendant for contractual royalties arising from defendant's use, either by itself or by its sublicensees, of the Kroll process of producing titanium. We remanded the case to our Commissioner to determine: (a) a proper royalty under the contract; (b) whether all the titanium was produced under the exclusive license or all or a part under sublicenses granted by the exclusive licensee; and (c) the total amount of production by the patented process.

Dr. Wilhelm Kroll, a metallurgist and inventor, was a citizen of Luxembourg, where he had a private laboratory. On March 26, 1934, Kroll entered into a contract with a German corporation called Siemens & Halske (hereinafter referred to as S&H) under which he was to collaborate with S&H on certain metallurgical processes. The agreement provided that S&H was to receive an exclusive license on any patentable invention developed by Kroll and that S&H would also have the right to grant non-exclusive sublicenses. The royalty rate payable was to be computed "depending on the importance of the invention." Any royalties paid by sublicensees were to be divided equally between the parties.

In 1936, Kroll developed a process for producing titanium. This process was within the scope of the 1934 agreement. On June 25, 1940, Kroll secured the issuance of United States Letters Patent No. 2,205,854 on his invention.

Titanium-bearing ore is relatively abundant, but prior to Kroll's invention refined titanium was brittle and unworkable because of its high oxygen content. Kroll's purpose was to eliminate the oxygen. Simply stated, his method for refining titanium from titanium-bearing ore was to heat a titanium halide, such as titanium tetrachloride, in a crucible in combination with an alkaline earth metal. An inert gas was introduced into the crucible to exclude air. The resultant chemical reaction produced relatively pure titanium; magnesium chloride contamination was washed away with water. This method of refining titanium was a

"batch" process: after the end-product was removed from the crucible, the crucible was cleaned and used to produce a new batch of titanium.

With certain refinements necessary to develop Kroll's small-scale process to the point where the output was large enough to justify commercial exploitation, it is the method in use today. These refinements were the result of technical studies begun in 1938 by the United States Bureau of Mines. Attempts to develop a continuous production process or to refine commercially useable titanium by other methods, such as an electrolytic process, proved unsuccessful.

After the Second World War broke out and the Germans overran and occupied Luxembourg, the Alien Property Custodian, acting pursuant to Section 12 of the Trading with the Enemy Act, 40 Stat. 411, 423 (1917), 50 U.S.C.App. § 12 (1958), "vested", i. e. took title to, Kroll's patent. The statute permitted the Custodian to do so upon a finding that Kroll was an enemy alien or resided in enemy-held territory. The Custodian erred in so finding: Kroll had come to the United States in February of 1940, prior to the vesting. In 1947, Kroll instituted a suit against the Alien Property Custodian in the United States District Court for the District of Columbia under section 9(a) of the Trading with the Enemy Act, claiming his patent was not subject to seizure by the Custodian. The District Court held that, inasmuch as Kroll was neither an enemy alien nor in enemy-held territory at the time of the vesting, he was entitled to the return of his patent, but that, since S&H was an enemy alien, the Attorney General, who had succeeded the Alien Property Custodian (Exec.Order No. 9788, 11 Fed.Reg. 11981 (1946)), could retain that firm's rights under the 1934 agreement. The judgment, which was affirmed in Kroll v. McGrath, 91 U.S. App.D.C. 172, 199 F.2d 187 (1952), also provided that the parties should negotiate a proper royalty for sublicenses, but that, if they failed to do so within 30 days, the court would set the rates. The parties could not agree. Accordingly, on December 1, 1953, the District Court made an order setting a royalty rate, retroactive to April 3, 1951, of 5 percent of the gross sales price of the first 50,000 pounds of titanium produced by any sublicensee under the patent claims, 3 percent on the next 50,000 pounds, and 1 percent on all production in excess of 100,000 pounds. The order also provided that any sublicense issued by defendant must provide that one-half of the royalties should be paid directly to Kroll.

So far as appears from the record before us, neither party appealed from the order fixing the royalty rate or asked the court to modify it.

The Attorney General thereupon transferred title to the patent to Kroll, but retained the rights of S&H under the 1934 agreement.

■ Before discussing the Commissioner's report on the matters referred to him, we shall dispose of the defendant's defense, that these plaintiffs have not adequately proved that they acquired Kroll's rights. The evidence adduced at the trial, however, amply substantiates plaintiffs' claim to ownership of the patent. It shows that Kroll assigned his rights to a Nevada corporation that dissolved. The plaintiffs herein, being all of the shareholders of that corporation, became joint owners of Kroll's patent rights as a result of the dissolution. According to the transcript and the exhibits, defendant, on many occasions, treated with plaintiffs and their predecessor corporation as owners of the patent. In the absence of any countervailing proof, these admissions have sufficient evidentiary weight to establish plaintiffs' ownership and right to sue. Consequently, we think defendant's contention is not well taken.

After World War II ended, it became clear to various Government officials that the advent of military jet aircraft made expansion of existing titanium facilities well-nigh mandatory. Titanium alloys combine a favorable strength-weight ratio with a high melting point. They are, therefore, vital in the construction of high performance jet aircraft, particular-

ly in airframes and jet engines, where aluminum is not an adequate lower-cost substitute. The Bureau of Mines had constructed a pilot plant for producing titanium through the Kroll process. Various private concerns were invited to examine this facility to encourage them to develop similar facilities of their own. After the Korean War began, the need for large-scale production of titanium became even more critical.

In the consideration of this case it is necessary to keep in mind that some of the Government's actions affecting the production and sale of the titanium here involved have been in its character (1) as the successor to the rights of S&H under the contract with Dr. Kroll, and (2) as the sovereign. We must exclude from our consideration whatever it may have done as sovereign and consider only its rights and liabilities as the successor of S&H.

As such successor it had all the rights of an exclusive licensee of the Kroll patent, which meant that it had the right to produce titanium by using the Kroll patent, to use the titanium so produced, and to sell it. For the exercise of this right it was obligated to pay to Kroll a royalty "depending on the importance of the invention." It also had the right to grant sublicenses. For titanium produced by the Kroll process by a sublicensee, the sublicensee was obligated to pay one-half of the stipulated royalty to Kroll and one-half to the United States, as the successor of S&H, the exclusive licensee.

Beginning in 1951, defendant entered into a series of contracts with private manufacturers under which these producers would construct or expend facilities for producing titanium by the Kroll process. The licenses that were subsequently issued to implement these contracts provided for the payment of royalties by the manufacturers, in accordance with the rate fixed in the 1953 District Court order above referred to, with one-half of the royalty to be paid to the owners of the patent and the other half to the defendant. The parties agree that, during the period here involved, these vari-

ous producers paid $1,786,083 to Kroll and his successors in title and a like amount to the United States. No royalty was ever paid to the patent owners on the titanium produced by the Bureau of Mines.

These production contracts are the principal concern of this case. Defendant says that they were made pursuant to S&H's contractual right to grant sublicenses under which the patent owner was entitled to one-half of the royalty and the exclusive licensee the other half, and that plaintiffs are not entitled to more than what they have already received, except, perhaps, for payment on account of the Bureau of Mines' output. Plaintiffs, on the other hand, contend that the manufacturers produced titanium on behalf of the Government and completely for its purpose. Therefore, they conclude that the production by the contractors was production by defendant itself and, hence, defendant is bound to pay the full royalty to the owners of the patent.

There were a total of eleven separate agreements made with five domestic producers, but the contracts appear to have followed a set pattern. At the outset, the contracts provided that the contractor would construct titanium facilities or, in the case of one producer, expand its then-existing facilities so that it could achieve and maintain a stated minimum capacity. This expansion and new construction were financed in whole or in part by Government loans under the Defense Production Act of 1950, 64 Stat. 798, 50 U.S.C.App. § 2061 (1958), section 302 of which authorized the President to make loans to private business enterprises for the expansion of capacity in the production of vital metals and minerals in order "[t]o expedite production and deliveries or services to aid in carrying out Government contracts for the procurement of materials or the performance of services for the national defense * * *" The contracts also gave the Government a right of first refusal to purchase all or a specified portion of the contractor's output. As to any balance remaining after the Government's exercise of its option,

or in the event there was no such exercise, the contractor was required to offer its titanium on the open market. After this offer was made, the Government was obligated to purchase any residue that remained unsold. In the event of a sale to the Government, either through the right of first refusal or by way of a required purchase, the price would be the lower of the then-current market price for titanium or a specified figure that varied from contract to contract, from a low of $3.95 per pound in one to a high of $5 per pound, the most frequent amount.

After production under these initial contracts was underway and the loans had been repaid, the Government entered into supplemental agreements with most of the producers. Under these agreements, the Government was bound, at the option of the contractor, to purchase not more than a specified quantity of the output at a price equal to the lower of the market price or a stated figure, which was somewhat lower than the price fixed in the original contract.

Defendant also made contracts under which it licensed two Japanese concerns to manufacture titanium with the Kroll process. Then, acting through the Commodity Credit Corporation, defendant agreed to purchase all of the output of these foreign manufacturers in exchange for surplus agricultural commodities.

As a result of these arrangements, there was commercially produced 85,-531,953 pounds of titanium between August 1, 1951, when the first contract was signed, and June 25, 1957, when the Kroll patent expired. Of this amount, the defendant purchased 32,707,537 pounds for its stockpile, or, 38.2% of the total production, at an average price of $4.05 per pound. The Government did not exercise its right of first refusal under any of the agreements, but purchased the residue in the hands of the producers after they had sold all that they could sell on the open market. In addition to the 32,707,537 pounds purchased by the Government, the Bureau of Mines also produced 492,513 pounds, all but a small amount of which the Government put in its stockpile. The balance of 52,824,416 pounds was sold primarily to persons having contracts to manufacture jet airplanes for the United States.

Until May 1954, the titanium producers were privileged to sell their product to anyone who would buy it, but the manufacturers of jet airplanes for the United States were practically the only people in need of titanium at that time. However, in May 1954 the Business and Defense Services Administration issued an order, pursuant to sections 101 and 102 of the Defense Production Act of 1950, supra, requiring producers of titanium to channel all of their output to defense contractors in accordance with allocations and priorities set up by this agency. But practically all of their output had been going to such contractors anyway, because they were the only ones in the market for it.

It must be held that all of the titanium purchased by defendant under its contracts with the producers, obligating it to purchase all the titanium which they could not sell on the open market, was produced under defendant's exclusive license to produce, use, and sell. Such a license is not restricted to production by the licensee personally or use by him personally or sales by him personally. It permits him to employ others to assist him in the production, and in the use and in the sale of the invention. Nor need he take any personal part in the production. A licensee having the right to produce, use and sell might be interested only in using the article or in selling it; in order to use it or sell it, the article must be produced; to have it produced, his license permits him to engage others to do all the work connected with the production of the article for him. Production of the article for the use of the licensee is production under the license.

Not so under a sublicense, unless the sublicensee is producing for the original licensee. To produce for his own use or for the use of someone else, the sublicensee may do so only under a sublicense. So the test is, whether the production is

by or for the use of the original licensee or for the sublicensee himself or for someone else.

Kroll granted a license to S&H to produce, use and sell titanium at a stipulated royalty. He also granted S&H the right to license others to produce, use and sell on a royalty arrangement whereby Kroll only got one-half of the royalty and the original licensee one-half. The parties of course intended that where the production was for the use of the original licensee it called for full royalty. It was only where the production was for the use and benefit of another that Kroll got one-half royalty and the original licensee, one-half. To the extent that the Government bought the titanium for its own use, it is liable for the full royalty. This amount was 32,707,537 pounds. In addition, the defendant itself, through its Bureau of Mines, produced 492,513 pounds, making a total of 33,200,050 produced by or for the defendant.

However, 52,824,416 pounds were sold by the sublicensees on the open market for their own account at whatever price they could get for it. Such sales were not to or for the defendant. They were sales authorized by the sublicenses. They could not have been made except for the sublicenses. The contract required that the royalty on such sales be divided between the patent owner and the licensee. That has been done.

It matters not that all but a small amount not sold to the United States was sold to manufacturers under contract to make jet aircraft for the United States. That the greatest part of the titanium was so sold was because these manufacturers were almost the only people in the United States in the market for titanium, since, at that time, very few, if any, jet airplanes were being produced for private use. But, whatever the reason, the sales were made by the private titanium-producing companies to private airplane manufacturing companies as the result of private negotiations in which defendant took no part. The United States was not a party to the contracts.

If either party defaulted, the United States was in no way liable. If a profit was realized, the producer got it; if he lost money, he had to stand the loss. It is true the defendant's agreement to take the unsold titanium off the hands of the producer at a stipulated price fixed a floor on the price the airplane companies had to pay, but this was only an incidental effect of the Government's agreement with the titanium producer. Other than this, the defendant influenced in no way the negotiations between the producer and the purchaser.

After the loans had been repaid to defendant, it was obligated to take no more than a specified amount of the production; the balance the producer had to sell on the open market, taking the risk of loss, if any, and enjoying the profit, if any.

■ This was the situation until May 1954 when, pursuant to the Defense Production Act, allocations and priorities in the disposition of titanium were set up, resulting in the manufacturers of airplanes for the defendant getting practically all of it. This, however, does not affect the contractual rights and liabilities of the parties because this was an act in the Government's capacity as the sovereign, and not as contractor. Cf. Deming v. United States, 1 Ct.Cl. 190 (1865); Jones & Brown v. United States, 1 Ct.Cl. 383 (1865); Horowitz v. United States, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736 (1925), affirming 58 Ct.Cl. 189 (1923); Froemming Bros. v. United States, 70 F. Supp. 126, 108 Ct.Cl. 193 (1947), and cases there cited; Anthony P. Miller, Inc. v. United States, Ct.Cl. No. 3–62, decided April 5, 1963.

■■ Of course the defendant's act of lending the producer money to equip his plant for the manufacture of titanium by the Kroll process and the agreement to take the unsold output at a stipulated price did not make the producer the Government's agent in the production of titanium. The defendant *loaned* the producer the money; it did not *invest* it in its business. If the producer made

money, it got all the profits; if it lost money, the defendant bore no portion of the loss.

It may, at first blush, seem strange that defendant should have to pay the patent owner full royalty on the titanium it stockpiled and not only pay nothing on the titanium that went into its airplanes but, instead, get one-half of the royalty on it. But it must be remembered that the defendant is the successor to the rights of S&H, a German corporation. Kroll required this corporation to pay full royalty on the titanium it itself manufactured or had someone manufacture for it; but he was willing to get only one-half of the royalty produced under a sublicense and let S&H get the other half, for the obvious purpose of stimulating the production of titanium. The more the production, the greater the royalties.

The United States succeeds to these rights, all of them, and to no less than these rights. It pays full royalty on the 33,200,050 pounds produced by or for it. On the 52,824,416 Kroll gets one-half and defendant one-half.

The parties agree on the total quantity produced but they disagree on the question of a proper royalty under the contract. The agreement between Kroll and S&H expressly left this matter for future determination; Article 5 provides that "The amount of the royalties to be paid by S&H [sic] to Dr. Kroll is to be computed depending on the importance of the invention. * * * "

Our Commissioner, acting pursuant to the terms of the reference, heard testimony and received other evidence pertaining to the proper amount of a royalty for use of the Kroll process. He found that the graduated 5–3–1 percent royalty rate fixed by the District Court in 1953, when applied to the prices received by defendant's licensees throughout this period, produced an average royalty of 1.14 percent. He concluded that this royalty rate was a proper one, considering "the importance of the invention," and should be applied to all production during the relevant period, even though such production was pursuant to

defendant's exclusive license. Both parties have taken issue with the Commissioner's determination. Plaintiffs say the 1.14 percent rate is too low; defendant says it is excessive.

So far as the royalty to be paid by sublicensees is concerned, that question has been settled by the decision of the District Court, supra, by which the parties are collaterally estopped. The present plaintiffs are the successors in title to Dr. Kroll, and McGrath was at the time the Attorney General of the United States. Cf. Commissioner v. Sunnen, 333 U.S. 591, 601, 68 S.Ct. 715, 92 L.Ed. 898 (1948); Bander v. United States, Ct.Cl. No. 84–62, decided April 5, 1963, slip op. pp. 6, 7. But it is not determinative of the royalty to be paid by the exclusive licensee, although it is quite persuasive. If this is the royalty to be paid by the sublicensees, as we must hold it was, we can think of no good reason why it is not also the royalty to be paid by the original licensee. The Commissioner took into consideration the importance of the invention, the money spent to adapt it to commercial use, the uncertain state of the market for titanium, the conflicting testimony of the experts, and came to the conclusion that the rate fixed by the District Court should also be applied to the titanium produced for or by the original licensee. We agree with his conclusion.

Defendant has interposed a counterclaim based upon the fact that plaintiffs received royalty payments on titanium produced before June 25, 1957, the date when the Kroll patent expired, but sold after that date. Defendant maintains that plaintiffs were not entitled to receive any payments on sales of titanium subsequent to the expiration date of the patent, and it wants plaintiffs to turn over any royalties paid on such sales. This is an action on a contract, and defendant's rights and liabilities are derived therefrom. Under that contract, the patentee has the right to royalties on titanium *production* as long as his patent subsists. It is immaterial that the sale came after the patent expired,

although the amount of the royalty is measured by the ultimate sale price. Defendant's contention, therefore, considered either as a counterclaim or as a partial defense, is not well-taken.

■ Since this is a contract action and not an infringement suit, plaintiffs' claim for interest must also fall. There is nothing in the contract, upon which the plaintiffs sue, that expressly obligates S&H or its assigns to pay interest in addition to the royalty. Under the provisions of 28 U.S.C. § 2516(a), therefore, plaintiffs are not entitled to recover interest.

The licenses which defendant issued to the several producers of titanium provided that half of the royalty, at the rate we have found to be proper, would be paid to the owners of the Kroll patent and the other half would go to defendant. That was done, and each of the parties received $1,786,083. On this production defendant is not otherwise liable. Of the total amount of titanium that defendant acquired, it obtained 32,707,537 from its commercial producers. Application of the 1.14 percent royalty rate and the average $4.05 price per pound to this figure produces a total royalty of $1,510,-106.98. The owners of the patent received $1,786,083 from the producers, but only 38.2 percent of this amount, or $682,-283.71, was applicable to the titanium which went to defendant's stockpile. Deducting the $682,283.71 which the patent owners have heretofore received from the $1,510,106.98 that they are owed on account of commercial production produces a difference of $827,823.27. In addition, plaintiffs are entitled to a royalty on the output of the Bureau of Mines. The Bureau produced 492,513 pounds of titanium under the Kroll process. Since the average price paid by defendant during the period in question was $4.05 per pound, the Bureau's production had a value of $1,994,677.65. Application of the 1.14 percent royalty rate to this sum produces a royalty of $22,739.33 to be added to the $827,823.27 due on account of commercial production.

Plaintiffs are entitled to recover $850,-562.60, and judgment will be entered in their favor for this amount.

Defendant's counterclaim will be dismissed.